RAY SHORE, complainant-respondent,

*v.*

JOSEPH B. SHORE, defendant-appellant.

[Decided October 20th, 1924.]

1. Evidence on a bill for maintenance considered, and *held* that the efforts of a husband, who had left his wife suddenly and in the middle of the night, to have her rejoin him and resume their married life were not sincere and did not affect her right to support although she was still living apart from him.

2. Where the order obtained against a husband in the juvenile court requiring him to make payments to his wife is vacated by that court upon the husband's filing a petition for divorce, the wife may enforce her own remedies against the husband or his property for maintenance under the Divorce and Maintenance act. *P. L. 1902 p. 482.*

3. The public policy prescribing corroboration of the parties in actions for the dissolution of the marriage relation does not prevail in suits for maintenance, and a court of equity may make a decree in favor of the wife on such a suit although her testimony is uncorroborated. *Pinkinson* v. *Pinkinson, 92 N. J. Eq. 669,* followed.

On appeal from the court of chancery.

*Mr. William Elmer Brown, Jr.,* for the complainant-respondent.

*Messrs. Cole & Cole,* for the defendant-appellant.

The opinion of the court was delivered by

CLARK, J.

The young people concerned in this appeal from the court of chancery were married September 14th, 1919. Their marital happiness seems to have been of a decidedly ephemeral character. Early on the morning of October 30th, 1919, or about six weeks after their marriage, defendant left the room they occupied in Atlantic City, and they have not lived together since. The husband and wife give conflicting accounts of the circumstances surrounding this nocturnal flitting on the part of the former. Suffice it to say that the defendant's story that he had selected the unconventional hour of two A. M. to move into a new apartment seems hardly credible. Furthermore, his note of the next morning, demanding his clothes and guaranteeing their production by economic threats, is not in harmony with the idea of a family moving.

From that time until the present, the history of the relations of these parties, with one exception, is to be found largely in the court records of the state. We shall deal with the exception more fully hereafter. On March 26th, 1920, Mrs. Shore complained to the juvenile court of Atlantic county and charged that her husband was a disorderly person, because he had abandoned her and was refusing to support her. This proceeding was apparently—although the record is silent on this point—had under section 17 of the Disorderly Persons act as amended (*P. L. 1911 p. 117*), and the act conferring upon the juvenile court concurrent jurisdiction over such causes. *P. L. 1912 p. 630,* as amended, *P. L. 1918 p. 214.* At any rate, after a hearing at which he was

examined, Shore was ordered to pay his wife $7.50 a week. Some time in August, 1920, defendant filed a petition for divorce in the court of chancery, to which complainant in this action filed her answer and cross-petition. The court of chancery ordered the payment of alimony *pendente lite,* and, in consequence of that order, the juvenile court vacated its former order for the payments under the authority of the Disorderly Persons act, *supra.* The petition and cross-petition in the divorce action were heard by the learned vice-chancellor who sits below in this cause, and were dismissed for lack of corroborative proof. Three months after this dismissal the present bill for maintenance, under section 26 of the Divorce act (*P. L. 1907 p. 482*), was instituted, and was disposed of by the court of chancery in accordance with the contentions of the complainant.

The rose among the thorns of all this litigation was a note sent by the defendant to his wife on February 12th, 1920, approximately fourteen weeks after he had so unceremoniously left his bride. This note informed her that he had "fixed up some rooms and wanted her to come back." It was typewritten down to and including the signature. It seems to have been neither preceded nor followed by any personal conversations or interviews nor even requests for such conversations or interviews on the part of the husband. The rock on which the matrimonial bark originally foundered appears to have been a decided difference of opinion as to the economic scale on which the future home was to be based. Mrs. Shore, true to the traditional conception, preferred an apartment which her spouse considered beyond their means —this income was derived from his ownership of a small drug store. The note made no allusion to the character of these proposed quarters, and was altogether anything but the burning words of a repentant and repining husband. That it did not, however, belie his real feelings, is apparent from his own testimony in the juvenile court a month later, where he stated that his regard for his wife was that of a "friend."

. The learned vice-chancellor held that the defendant had abandoned his wife within the meaning of the statute, and in this conclusion we agree with him.   The other element necessary before the wife could prevail in a suit for maintenance under the statute, namely, the failure to provide for her, being admitted, he properly decreed the payment of $10 per week. *Weigand* v. *Weigand, 41 N. J. Eq. 202.*   The physical separation of the couple being also admitted, we need only concern ourselves, as did the court below, with the mental element also essential, under the terms of the statute, to constitute an abandonment without justifiable cause.   On this point we think the reasoning of the learned vice-chancellor is sound.   The attempt of the defendant to place upon his wife the responsibility for the breaking up of their home was, in our view, specious.   A husband who leaves the bedside of his recent bride stealthily and by night must do more than send her a formal invitation some months later to rejoin him in the rooms, which were the original *casus belli. Parker* v. *Parker, 57 N. J. Eq. 577.*   Any other doctrine would, in our opinion, enable errant husbands too easily to escape their duty of support.   We acknowledge the husband's right, within reasonable limits, of course, to select the home and prescribe its incidents.   Nevertheless, a disagreement, even on that vital issue in their wedded life, does not entitle a husband to follow up an unreasoning departure with a cold-blooded request for his wife's return, unaccompanied by the natural evidences of affection, which would convince her of the sincerity of his desire for the resumption of their married life.

We feel constrained to touch upon two other matters not dealt with in the opinion of the learned vice-chancellor, although they seem to have been argued to some extent before him, and appear in the briefs of counsel presented to this court.

It is suggested that the proceedings in the juvenile court are a bar to the present action for maintenance, and the case of *Roarke* v. *Roarke, 77 N. J. Eq. 181,* is cited in support of

this position. We think that the facts in the case at bar make the legal principles applicable quite distinguishable from those applied by the court of chancery in that case. We shall therefore venture to express no opinion upon the views therein expressed. It is fundamental that a judgment is necessary to support a plea of res judicata. 24 Am. & Eng. Encycl. L. 792. Equally, of course, such a judgment must be final, and so a judgment which has been vacated or set aside cannot operate as a bar. 24 Am. & Eng. Encycl. L. 813; Graefs v. Bernard, 162 Mass. 300. Since, in the instant case, the order of the juvenile court was vacated, we need be troubled no further on the score of res judicata.

It is, of course, obvious that section 17 of the Disorderly Persons act and section 26 of the Chancery act give to an abandoned wife two forums, in each of which she may prosecute her remedy for support. The court of chancery in the case of Roarke v. Roarke, supra, found an election between these two where the injured wife was being paid under an order of a magistrate. That a person cannot pursue both of two inconsistent remedies is an established doctrine of the law. 7 Encycl. Pl. & Pr. 767. This is simple of statement but difficult of definition. The authorities are in considerable confusion as to just what remedies are inconsistent and require an election, and what other remedies are cumulative and can be pursued concurrently. 9 Rul. Case L. 958. Fortunately, we do not feel that we need possibly add to the confusion by deciding that question as to the remedies employed in the case at bar. The reason underlying the doctrine of election of remedies is the desire of the courts to afford protection against the danger of vexation by litigation. United States v. Oregon Lumber Co., 260 U. S. 290. It is not fair to require a man to prepare his proofs successfully on one theory, only to be assailed later on another inconsistent theory. It is a different matter, however, when the moving party's remedy has proved ineffective, not through the incidences of the proof, but because the opposing party has himself, through action extraneous thereto, brought about

a different legal situation. *Palmer* v. *Bizzell, 229 S. W. Rep.* (*Tex.*) *971.* Such, we think, was the action of the defendant in bringing the action for divorce, which resulted in the vacation of the order of the juvenile court, and, therefore, made any election of no binding effect. Although counsel do not appear to have cited it, we are reinforced in this view by the opinion of Vice-Chancellor Emery in the case of *Becker* v. *Becker, 90 Atl. Rep. 675,* where he distinguished *Roarke* v. *Roarke, supra,* on a state of facts on all fours with those of the instant case.

The well-settled rule that a divorce will not be granted upon the uncorroborated testimony of the parties requires little citation of authority. *McShane* v. *McShane, 45 N. J. Eq. 342:* It might be observed, however, that where it is necessary to establish as part of the complainant's proof a mental state in one or the other of the parties, as in the instant case, the courts have been somewhat troubled by the strictness of the rule. This has led to their finding corroboration in the "circumstances of the case as shown by the expression and conduct of the defendant, together with the letters of the parties." *Foote* v. *Foote, 71 N. J. Eq. 273.* We are inclined to think that the attitude of defendant in this case, together with his letter, brings it within the rule above cited and furnishes sufficient corroboration. However that may be, inasmuch as defendant's counsel seeks to apply this rule to actions for maintenance under the statute and to defeat the complainant's case on that ground, we shall address ourselves to the point.

This question appears to have been resolved contrary to defendant's contention by the *ratio decidendi* of a recent case in this court. *Pinkinson* v. *Pinkinson, 92 N. J. Eq. 669.* It is therefore unnecessary to consider it at length in this opinion. We know that in the later Roman and the civil law generally the process of proof rested fundamentally on a numerical system. *Wigm. Ev.* (*2d ed.*) *2033.* The same was true of the canon or ecclesiastical law. This system, in attempting to measure the probative value of a wit-

ness's assertion, to a great extent overlooked the personal element behind the assertion. It never prevailed generally at common law, largely probably because the fact that the jurors were originally themselves witnesses, made impossible any numerical balance. Nevertheless, we can readily call to mind both certain kind of witnesses, *i. e.,* accomplices, and certain kinds of issues that require corroboration, even in our system of law. Among the latter, actions for divorce have always been included. This has been the case in some jurisdictions by statute. In New Jersey, however, there is no statute to that effect, and the rule has been declared to rest in considerations of sound public policy. *Rogers* v. *Rogers, 89 N. J. Eq. 1.*

The public policy which has influenced the courts is, of course, their interest in preserving the married status, so important to the state, from dissolution by means of collusive testimony. Thus, both because of the nature of the issue and the kind of witnesses adduced thereto, corroborative evidence is insisted upon in actions for the dissolution of the marriage relation. Mr. Justice Katzenbach, in *Pinkinson* v. *Pinkinson, supra,* points out that a bill for maintenance is intended to preserve, not dissolve, the marital status, in that it is aimed at enforcing the duty of support by a husband, one of the primary obligations flowing from the relationship. Furthermore, since separation agreements are permissible, we can think of no reason why a husband should prefer to have his wife's support ordered by a court as the result of collusive testimony. The judicial history of the rule requiring corroboration in divorce actions indicates that the courts adopted the theory prevalent in the ecclesiastical courts when they found it consonant with their conceptions of public policy. As we have seen that the policy applicable to bills for maintenance is a different one, it is not necessary to go into the question of whether the jurisdiction over such bills is purely derived from statute, or is a continuation in the court of chancery of the jurisdiction of the ecclesiastical courts. See *Lynde* v. *Lynde, 64 N. J. Eq. 736.*

The decree is affirmed.

*For affirmance* — THE CHIEF-JUSTICE, TRENCHARD, PARKER, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL, LLOYD, WHITE, GARDNER, VAN BUSKIRK, CLARK, MCGLENNON, KAYS—15.

*For reversal*—None.