Rose Greenspan, complainant,

*v.*

Louis Greenspan, defendant.

[Decided February 7th, 1941.]

*Mr. Nathaniel W. Franzblau,* for the complainant.

*Mr. Irving L. Werksman,* for the defendant.

Stafford, A. M.

The complainant, Rose Greenspan, on or about March 2d, 1937, filed a bill for maintenance, wherein she charged that the defendant, Louis Greenspan, had obtained a decree of divorce against the complainant in the Republic of Mexico, State of Morelos, but that the same had been procured by fraud, suppression of the truth, and false statements, and that the courts of Mexico at no time had jurisdiction over the subject-matter or jurisdiction over the complainant or defendant. As a result thereof, the complainant charges the said decree of divorce is a nullity and petitions this court to declare the said decree to be null and void.

Under the second cause of action in the said bill of complaint, the complainant charges the defendant with abandonment, commencing during the month of December, 1932, coupled with an additional allegation that the defendant, although he has been contributing toward the support of the complainant and her children it was a meager contribution; further alleging that since January, 1937, the defendant failed to make any contributions toward the support and maintenance of the complainant and a dependent child.

The defendant answered, denying the material allegations set forth in the bill of complaint, and alleged that he at all times adequately and fully maintained and supported the complainant and the children of the marriage.

Defendant, in his answer to the allegations set forth under the second cause of action, entered a special appearance, asking leave to be heard thereon before the matters in issue were determined by the court, alleging further that neither the complainant nor the defendant were residents of the State of New Jersey; that the domicile of both the complainant and the defendant was in the State of New York, and that by reason thereof the Court of Chancery of the State of New Jersey is without jurisdiction. Defendant further alleged in said answer that no *subpœna ad respondendum* was issued out of the State of New Jersey, commanding the complainant to make answer to the bill of complaint.

Issue was joined and the matter came on for final hearing.

The marriage of the parties was proved and corroborated, but the question of residence in the State of New Jersey has been disputed by the defendant.

The evidence reveals the fact that the complainant and defendant were married in the city of New York on or about September 6th, 1913, and as a result of the said marriage three children were born: Herman, twenty years, Irene, twenty-two years, and Mary, twenty-four years.

Apparently the family life was not a very happy one, and in the month of December, 1932, while they were living in the city of Brooklyn, State of New York, the final separation occurred, the complainant saying that the defendant just walked out of the house without saying anything and never returned since that time.

While they were living together, the complainant testified she received from the defendant the sum of seventy ($70) or eighty ($80) dollars weekly to take care of household affairs, but after the final separation he reduced this to the sum of thirty ($30) dollars a week. Later on, the defendant again reduced this allowance to the sum of fifteen ($15) dollars a week.

Shortly after the final separation, the complainant purchased a grocery store in Newark, New Jersey, where she lived, and operated the same for a period of three years, after which time she disposed of the same for the reason, as she testified, when the children got older they didn't like working in a grocery store.

While the complainant was living in Newark, during the month of June, 1935, she was served with papers printed in the Spanish language. These papers admittedly constituted the service of divorce proceedings commenced by the defendant against the complainant in the Republic of Mexico, State of Morelos.

The complainant consulted a lawyer about these divorce papers, but never took any steps to file an answer or defend or protect her interests in the matter.

After the service of these divorce papers, the defendant continued to support his wife and family irregularly in the sum of fifteen ($15) dollars a week.

However, sometime during the month of January, in the year 1937, the complainant received information from her daughter, Irene Greenspan, that the defendant was not only divorced, but had remarried. The witness, Irene Greenspan, testified that she had visited her father in a hospital in the city of Passaic in the month of January, 1937, and while she was there her father informed her that he had remarried.

The receipt of this information about the remarriage of her husband changed the attitude of the complainant with regard to support and maintenance and, as a result of this change in attitude, the bill of complaint was filed in the instant case.

I will first discuss and examine the defendant's contentions concerning the allegations in the bill, and the jurisdiction of this court to hear and determine the same.

The defendant, in his answer, and of his own volition, attempted to enter a special appearance. The defendant also entered into a certain stipulation with the complainant in which, among other things, he attempted to reserve the right to enter a special appearance.

The file does not contain any record of any application for leave to file a special appearance; nor does the file contain any order allowing the same, and the mere fact that the defendant attempted to enter a special appearance in the answer, or that an application was made at the hearing, or the fact that the defendant entered into certain stipulations with the complainant, in which the defendant reserved the right to enter a special appearance, does not absolve the defendant from making his application to the court for an order permitting such special appearance. The reasons are obvious, and have been set forth very clearly in the case of *Swetland* v. *Swetland, 105 N. J. Eq.* (at *p. 608*), wherein Vice-Chancellor Berry stated: "So far as this court is concerned I consider it settled that a special appearance for the purpose of addressing a motion to the jurisdiction of the court, filed without leave, amounts to a general appearance. And it is my understanding of the law that this was always so where the question was one of jurisdiction over the person arising out of service of process."

In other words, before any steps may be taken in the cause, the defendant, if he desires to appear specially, must first apply to the court and obtain leave or permission so to do; otherwise, the defendant is appearing generally in the cause.

Defendant also claims this court lacks jurisdiction because neither the complainant nor the defendant were residents of the State of New Jersey, and this motion applies both to the date on which the bill of complaint was filed, and also the date on which the Mexican divorce decree was obtained. Whether or not the parties herein were residents of the State of New Jersey when the Mexican divorce decree was obtained is immaterial, as long as the residential requirements were present at the time of the filing of the bill.

This is a bill for maintenance, which is an action *in personam*. Being a personal action, it must needs be brought

in the state where the husband is located. The defendant was served in New Jersey, and from the evidence I find he resided in New Jersey at the time of such service. *Fried* v. *Fried, 99 N. J. Eq. 106.*

The complainant was a resident of New Jersey. A husband's domicile, in legal contemplation, is the domicile of the wife and is unchangeable by her except with his acquiescence or consent, or by such misconduct on his part inimical to the union as justifies her in selecting another. *Webb* v. *Webb, 13 N. J. Mis. R. 439.*

Defendant's abandonment of complainant in Brooklyn, New York, justified her in selecting another domicile.

This court entertains no doubt that when the defendant was served in this cause he was a resident of the State of New Jersey, living and working in the city of Passaic. Not only did his daughter testify as to admissions made by him concerning his residence, but defendant called as his own witness one Charles C. Gifford, a real estate agent, who testified that he rented to this defendant in January, 1936, an apartment located at No. 11 Offord street, Passaic, New Jersey.

Furthermore, the witness, Sylvia Millstein, testified that the defendant had admitted to her that he lived in the city of Passaic, New Jersey. Upon her re-examination later in the hearing, she attempted to change this testimony. At the time of the service of the *subpœna ad respondendum* the defendant was a resident of the State of New Jersey, and the service was valid.

Defendant further argues that in these proceedings the complainant has no right to attack a divorce decree of a foreign jurisdiction. This is answered by saying that under certain circumstances a foreign divorce decree may be impeached collaterally, as, for instance, in a suit for separate maintenance under the statute. *Fried* v. *Fried, 99 N. J. Eq. 106; 132 Atl. Rep. 674.*

"There is no reasonable distinction between the case of a wife who attacks the validity of a foreign decree in a maintenance suit, and a case in which she attacks the foreign decree interposed as a defense in a suit brought by her for

absolute divorce." *Shapiro* v. *Shapiro, 13 N. J. Mis. R. 788; 180 Atl. Rep. 434.*

Defendant further insists that the bill of complaint does not charge an abandonment and a refusal or neglect to maintain and provide for the complainant and her children, as required by the statute. It is true that these words are not actually used in the bill of complaint, but in paragraph 3 of the "First Count" we find "that in the month of Deecmber, 1932, the defendant deserted the complainant, unjustifiably and has refused to live with her."

Under the tile of "Second Count" we find "paragraphs 1 to 12 inclusive of the First Count are herewith made paragraphs 1 to 12 inclusive of the Second Count." And paragraph 13 of the "Second Count" recites: "Prior to January, 1937, the defendant has failed to properly maintain the complainant, but as previously stated, the defendant, to avoid adverse publicity, did not institute any legal proceedings." And paragraph 14 of the Second Count recites: "Since about January, 1937, the defendant has failed to make any contributions for the support and maintenance of the complainant and dependent children."

The prayer of the bill likewise petitions for suitable support and maintenance, &c.

While the bill undoubtedly was inartistically drawn, including the use of the titles "First Count" and "Second Count," rule 60, Court of Chancery, I am satisfied that all of the statutory requirements are present.

The defendant also argues that there was no service upon the defendant of a *subpœna ad respondendum.*

The file in this cause contains the original *subpœna ad respondendum* with the following words typewritten on the back: "Service of a true copy of the within subpœna to answer is hereby acknowledged this 10th day of March, 1937, and service thereof by the Sheriff is hereby waived. Louis Greenspan (in ink). Louis Greenspan, defendant (typewritten)."

Unquestionably this service was not made by the sheriff or any other proper officer, but service was simply acknowledged by the defendant himself.

*1 Comp. Stat. p. 412 § 6* recites:

"A written appearance in any suit in Chancery or a written acknowledgment of the service of any subpœna to answer, signed by a defendant or his solicitor, shall have the same force and effect as if such defendant had been legally served with a subpœna to answer by the Sheriff or any other proper officer; provided, such signature of the party be verified by affidavit."

The signature of Louis Greespan, defendant, was not verified by affidavit as required by the statute. This apparent irregularity of service, however, is rectified because the defendant did not obtain leave or permission of this court to appear specially. On the other hand, he not only filed his answer, but he called witnesses in his own behalf, although he himself failed to take the stand. This constitutes a general appearance.

It was held in *Frank* v. *Salzberg Co., 102 N. J. Eq. 107,* citing *Card* v. *Newlin, 71 N. J. Law 438:* "Indeed, after the defendant has entered a general appearance, the process by which he was summoned has fulfilled its function in that respect and becomes unimportant."

Now as to the merits of the case. I find there was an abandonment and refusal or neglect to support. The complainant testified that in December, 1932, while both parties were living in Brooklyn, New York, the defendant deserted her, and never again returned to live with her. The defendant was in court and heard these accusations made by the complainant, but he did not deem it necessary to take the stand and deny them. Furthermore, when called as a witness for the complainant, he admitted obtaining a Mexican divorce decree against the complainant, while, as he said, he lived in New York.

This decree was based upon incompatability of character, as will be shown hereafter. This admission, coupled with his failure to take the stand, although he was present in court, is sufficient corroboration of abandonment, if such corroboration is necessary. *Pinkinson* v. *Pinkinson, 92 N. J. Eq. 669; 113 Atl. Rep. 143; Shore* v. *Shore, 96 N. J. Eq. 661; 126 Atl. Rep. 320.*

At one time during their married life the complainant received from the defendant seventy ($70) or eighty ($80) dollars a week, but after the final separation this sum was

reduced to thirty ($30) dollars a week. This payment of thirty ($30) dollars a week continued until the complainant went to live in Newark, New Jersey, in which place she conducted a grocery store purchased from her sister. From the commencement of this business venture, the defendant reduced this weekly allowance to the sum of fifteen ($15) dollars, and these payments were intermittent and irregular.

While the amounts and the regularity of these payments might be in dispute, as a result of the cross-examination of the complainant, nevertheless, the defendant, although he was present in court, remained motionless in his seat and failed to take the stand to deny these charges. However, it is positive and undisputed that for a period of three weeks prior to the filing of this bill the defendant failed to make any payments whatsoever to the complainant.

The testimony shows the income enjoyed by the defendant was as follows: for 1934—$4,008.12; for 1935—$2,698.67; for 1936—$4,886.12; and practically fifty ($50) dollars a week for the years 1937 and 1938.

The amount contributed by the defendant to the complainant, irregular as it was, remained the same during the fat years as well as the lean years.

This support and maintenance was purely arbitrary on the part of the defendant. His reduction of his support from seventy ($70) dollars or eighty ($80) dollars a week to thirty ($30) dollars a week, and then to fifteen ($15) dollars a week, irregular as it was, undoubtedly was motivated by the complainant's purchase of the grocery store in Newark, New Jersey.

Under the circumstances of this case, one can reasonably come to the conclusion that the complainant was financially punished for attempting to make a living for herself and her children.

Of course, it is true there is no hard and fast rule in endeavoring to arrive at a just and proper amount a husband should contribute toward the support of his wife and children. Each case must be weighed and judged by its own particular set of circumstances. Even though separated the husband's duty continues, where he is at fault, and it is his

duty to contribute a commensurate share of his earnings, which is proper under a given set of facts.

"The mere fact that the husband fixed a sum of money to be given to his wife for her support and maintenance will not divest the Court of Chancery of the jurisdiction conferred by statute, if this sum is insufficient for her proper support." *Calabrese* v. *Calabrese, 104 N. J. Eq. 450; 146 Atl. Rep. 330.*

The defendant, apparently realizing that it was his duty to support his wife, agreed in writing to pay her the sum of seventeen ($17.50) dollars and fifty cents each week commencing March 20th, 1937. This agreement bears no date, but was filed with the clerk of this court on October 4th, 1937, which date is not only subsequent to the date of the Mexican divorce decree, and subsequent to the date of the defendant's remarriage, but is also subsequent to the date of the filing of the bill for maintenance in this cause. Notwithstanding these facts the defendant voluntarily agreed to support his wife and children.

The evidence is satisfying and convincing that the defendant not only abandoned the complainant, but refused and neglected to provide for the support and maintenance of herself and her children.

Sometime in the month of May, 1935, the defendant, who had abandoned his wife and children in the year 1932, while they were living in Brooklyn, New York, decided to obtain a Mexican divorce decree against the complainant. The complainant at that time was living in Newark, New Jersey, while the defendant, according to his own testimony when called as a witness by the complainant, resided in the State of New York.

As above stated the residences of the defendant and complainant at this particular time are immaterial. *Fried* v. *Fried, supra.*

It is an apparent fact that neither the complainant or defendant ever visited the Republic of Mexico, State of Morelos, at any time, and neither at any time attempted to establish a residence therein.

Sometime during the year 1935 the complainant, while residing in Newark, New Jersey, was served with these Mexi-

can divorce papers printed in the Spanish language, and, although she consulted an attorney she never took any steps to defend the action.

The defendant, who never visited Mexico at any time, was represented in court by one Jose Ventura, who attended to the necessary procedure, and on or about August 1st, 1935, the defendant, through the Civil Court of the State of Morelos, First Judicial District Republic of Mexico, obtained his divorce from the complainant. The grounds were incompatability of character.

It is hardly necessary to say that this state does not recognize incompatability, either of character or temperament, as a cause for divorce.

A foreign decree of divorce is not entitled to recognition under the full faith and credit clause of the United States Constitution, unless the court had jurisdiction over the subject-matter and both parties. *Thompson* v. *Thompson, 89 N. J. Eq. 70; 103 Atl. Rep. 856.*

Undoubtedly, as a sovereign state, Mexico had full power to enact legislation governing residential requirements of its *bona fide* citizens who seek the aid of its divorce courts. Likewise, to enact laws covering service of process on its own *bona fide* citizens, and also just what service would be necessary on non-residents, by publication or substituted service, outside its boundary lines, in order to determine jurisdictional requirements covering parties and subject-matter of the suit. These are matters which must be properly conceded to the Mexican authorities in legislating remedies for its *bona fide* citizens.

But, under the facts in this case, did the Republic of Mexico, through the State of Morelos, have jurisdiction of these parties in their divorce suit?

There is no doubt that the defendant abandoned the complainant while they were living together in the State of New York.

There is no doubt that the defendant was a resident of the State of New York when he commenced his divorce suit in Mexico. He admitted this on the witness stand.

There is no doubt that the complainant was a resident of the State of New Jersey when this Mexican divorce suit was

commenced. She was served with the divorce papers while living in Newark, New Jersey.

Apparently, neither the defendant or complainant ever visited Mexico, State of Morelos, much less ever attempted to establish a residence or domicile there.

Assuming that the Republic of Mexico and the State of Morelos, by legislative enactment, decreed that in divorce matters non-residents, those not even having a color or semblance of residence or domicile in Mexico, could, in writing, submit to the jurisdiction of its courts, without establishing any domicile whatsoever, and that this defendant, without leaving the State of New York, forwarded to the Mexican courts, in the State of Morelos, the necessary documents and affidavits in order to comply with its legislative requirements, would the Mexican divorce, in favor of the defendant and against the complainant, be entitled to recognition under the full faith and credit clause of the United States Constitution, and international comity?

Vice-Chancellor Stevenson, in the case of *Lister* v. *Lister, 86 N. J. Eq. 30* (at *p. 35*); *97 Atl. Rep. 170,* held: "It is, I think, the established law of this state that jurisdiction of a court to grant a divorce from the bond of matrimony cannot rest in the slightest degree upon the consent of either of the parties to the marriage, or of both of them. Any divorce granted by a court in a foreign state in which neither of the parties was a *bona fide* resident, would, I think, be treated as void by the courts of New Jersey even though neither of the parties was at any time a resident of this state. Of course it is not necessary to lay down such an extreme proposition in this case because the complainant was domiciled in New Jersey, the matrimonial domicile was here and the defendant's pretended change of domicile and residence was a fraud and a sham.

"A divorce suit is a suit *in rem*. The term *'res'* is one of somewhat wide content and it embraces not only lands and chattels but also the status of individuals, as parent and child, husband and wife, guardian and ward, and also the status of an individual, as a citizen and as a voter. The essential characteristic of an action *in rem,* I think, is to be found in

the power of the state through the decree or judgment of its court to dispose of the subject-matter of the suit, the *res,* in accordance with the object of the suit, whether that subject-matter be physical property or the status of one or both of the parties litigant. See *Amparo Mining Co.* v. *Fidelity Trust Co., 74 N. J. Eq. 197, 203; 71 Atl. Rep. 605.* In actions *in personam* judgments or decrees do not *ipso facto* accomplish the objects of the suits in which they are rendered. An execution follows which may be abortive, or proceedings may be taken to compel the defendant to do what he is directed to do by the decree, which proceedings may prove to be inefficacious. Suits for specific performance of contracts to convey real estate, formerly were actions *in personam,* and the decree only operated upon the person and might never operate to give the complainant the relief which was awarded him by the decree. Subsquent legislation, however, has in many states made such a suit an action *in rem* or *quasi in rem.* At present such suits when brought in a foreign state where the land in question does not lie, are purely actions *in personam* although if the land lay in the state where the suit was brought the action might be *in rem* or *quasi in rem.*

"A decree of divorce operates immediately and absolutely upon the status of the suitor which is the *res* in the suit. No execution, attachment or contempt proceedings are necessary in order to enforce the decree. From the very nature of the case, however, a decree of divorce by a court in Nevada, undertaking to dispose of the status in respect of marriage of spouses who are not resident in the state, would be a decree in the air. A husband and wife domiciled in New Jersey, while passing through the State of Nevada on a railroad train, certainly could not get off at Reno and immediately give a Nevada court jurisdiction to determine their status in respect of marriage, and dissolve their marriage even if the legislature of Nevada should undertake to give the courts of the state such extraordinary powers. An act of the legislature of a state undertaking to divorce all married persons who pass through the state on a railroad train, would never be recognized by courts of other states as

having the slightest trace of validity apart from all objections to such legislative action arising from federal or state constitutions. The State of Nevada is powerless by an act of its legislature, or by a decree of its court to fix the status of a man or woman as married or unmarried, when such man or woman is only transiently commorant within the borders of the state. The question whether a man is married, or is a citizen, or is a voter cannot arise in the State of Nevada, unless the man is a *bona fide* resident of the state, for the reason that it is of the nature of such a status that it pertains to individuals who are permanently located in the place where the status is to be recognized or denied. A spouse commorant in Nevada but actually resident in New Jersey, has no more power as against the State of New Jersey to carry his status in respect of marriage, from the State of New Jersey into the State of Nevada so as to subject such status to the power and control of the State of Nevada, exercised through its courts by an action *quasi in rem,* than he has to lift up a tract of land in New Jersey which he owns and transport it to the State of Nevada, so as to subject it to an action *quasi in rem* in a Nevada court. Where the *res* is land it is manifest that it cannot be moved out of the state where it lies. When the *res* consists of chattels it is equally clear that such *res* can be transported and located successively in very many states, and thus made subject to the power of such states exercised through courts, legislatures or other governmental agents. When the *res* is a status in respect of marriage, it can be transported in a certain way, viz., by transporting, or in other words, changing the residence of the party whose status is under consideration."

In *Reik* v. *Reik, 112 N. J. Eq. 234; 163 Atl. Rep. 907,* the husband entered Mexico on a tourist card, traveling from place to place, and obtained a decree of divorce in the State of Morelos, First Judicial District.

It was held that he was not a resident of Mexico, but was nothing more than a mere traveler, seeking recreation and a divorce.

The general rule of law is that jurisdiction over the subject-matter of divorce rests upon domicile, or at least residence

*animo manendi,* of at least one of the parties, and it is established by the great weight of authority that, notwithstanding the full faith and credit provision of the Federal Constitution, a decree of divorce rendered in one state may be impeached and denied recognition in another upon the ground that neither of the parties had such domicile or residence at the divorce forum; and this notwithstanding the recitals in the decree or record from the other state of the jurisdictional fact of domicile or residence. *Reik* v. *Reik, 109 N. J. Eq. 615; 158 Atl. Rep. 519.*

The first essential for the validity of a foreign decree is that it should be pronounced by a court of competent jurisdiction between the parties who are *bona fide* subjects of that jurisprudence. *Reik* v. *Reik, supra.*

The rule is certainly as strong, if not stronger, when applied to a judgment rendered in a court of a foreign country, toward which no duty is enjoined, and especially where the jurisprudence of such foreign country is in no sense based on common law. *Reik* v. *Reik, supra.*

The provision in the statute of Utah authorized her courts to grant divorces to citizens of foreign states and nations who were not, but desired to become, residents of Utah.

One Hood desired to obtain a divorce from his wife, although neither of the parties were at any time residents of the State of Utah. The court held: "The divorce manifestly was granted in violation of the sovereignty and jurisdiction of another state, and in violation of the plainest principles of international and constitutional law. The provision in the statute of Utah, authorizing her courts to grant divorces to citizens of foreign states and nations, who were not, but desired to become, residents of Utah, was *ultra vires* and void. No plainer or more palpable case of the exercise of extraterritorial jurisdiction could exist. Hood was not only not a citizen or resident of the territory, but he did not personally enter the territory so as to give it jurisdiction over him for temporary police purposes." *Hood* v. *State, 53 Ind. 263.*

To the same effect is the case of *Litowich* v. *Litowich, 19 Kan. 451.* Neither of the parties had ever resided in Utah; neither of them had ever been there, and neither of them had

ever had any expectation of residing there. Utah divorce held to be void for want of jurisdiction.

It is furthermore convincingly proved that the Mexican divorce decree was fraudulently obtained by misrepresentations going to the grounds of divorce, for the evidence in this case shows that the complainant was abandoned and deserted by the defendant while they were living in Brooklyn, New York. The defendant, although in court, offered no testimony whatsoever to contradict this evidence, and made no effort to take the stand to prove incompatability of character or temperament.

The procedure followed by the defendant in obtaining his divorce against the complainant smacks somewhat of a slot machine device. However, instead of putting a coin in the machine the defendant inserted a stamped envelope, and out popped a divorce.

Residence, apparently, means nothing in this mail order system of obtaining divorces. The ruthless spouse can, in one fell swoop, without cause or reason, destroy forever the family hearth and circle, and cast to the winds the love and affection of a surprised and bewildered family.

All law, international or otherwise, compels us to recoil at the thought of such procedure.

Our advanced ideas of civilization, culture, education, and refinement, together with our desires and efforts to promote, nurture, protect and fortify our moral standard of family life, will not permit us to descend to such a level. Not only should we frown upon such procedure, but we should roundly condemn the same. We are not throw-backs and have no desire to return to the moral gauges of the aborigines, the Indians and the Esquimaux.

The evidence in this case reeks with fraud, palpable, shameless and brazen.

Therefore, the divorce granted by the Mexican court must be declared to be invalid in this state, through lack of jurisdiction.

I will also advise a decree on the bill for maintenance in favor of the complainant and against the defendant.

The complainant may make application for allowances and counsel fee on the next motion day.