Merrimack,
Jan. 5, 1937.

GLADYS N. BOWDLER

*v.*

ST. JOHNSBURY TRUCKING COMPANY & a.

*Laurence I. Duncan* and *Robert W. Upton* (*Mr. Duncan* orally), for the plaintiff.

*Demond, Woodworth, Sulloway, Piper & Jones* (*Mr. Piper* orally), for the defendants.

BRANCH, J. "No person shall operate a motor vehicle upon any way in this state unless licensed . . . or permit such a vehicle owned

or controlled by him to be so operated by a person not so licensed, except as otherwise herein provided." P. L., *c.* 101, *s.* 9. The only exception is that of persons being taught to operate if accompanied by a licensed operator. *Ib. s.* 10.

The driver of the plaintiff's car did not have a license, although it might be found, and must here be assumed, that she reasonably believed that he did have one. The defendant argues that by allowing her car to be driven by a person who, in fact, had no license, the plaintiff violated the statute; that the question of her knowledge or belief is immaterial and that the rule laid down in the case of *Johnson* v. *Railroad*, 83 N. H. 350, precludes a recovery by her.

"Undoubtedly it is within the power of the legislature to declare an act criminal irrespective of the intent of the doer of the act (*State* v. *Cornish*, 66 N. H. 329; *State* v. *Ryan*, 70 N. H. 196) but the question whether criminal intent is a necessary element of a statutory crime is one of statutory construction." *Coutremarsh* v. *Metcalf*, 87 N. H. 127. As ever in such cases the problem is to be solved by an ascertainment of the legislative intent. The question here in issue was not raised in *Johnson* v. *Railroad, supra,* and the court carefully refrained from expressing an opinion upon it. "The suggestion that although blamelessness in fact may be made ground for liability, it is not usually cause for complaint . . . has no application here. There is no question but that the plaintiff knew his driving a car was prohibited." *Ib.*, 354.

In determining the intent of the legislature an important factor to be considered is that "principle of natural justice" to which the common law early gave expression in the maxim *"actus non facit reum nisi mens sit rea."* Broom's Legal Maxims, 306. In *Lyons* v. *Child*, 61 N. H. 72, 75, this principle was stated by *Doe*, C. J., as follows: "An act which a man does not intend to commit, of which he is unconscious, and for which he is in fact blameless, is not ordinarily imputed to him as a penal offence by the unwritten or the written law." In that case this principle and the closely related rule which in civil cases "generally imposes liability for actual fault only" were held to be of controlling importance in the construction of that provision of the law of the road which provides that a traveler in a vehicle shall seasonably turn to the right when meeting another vehicle traveling in the opposite direction. G. L., *c.* 75, *s.* 11 (P. L., *c.* 90, *s.* 1). It was there held that the defendants were not chargeable with a "constructive fault" when they "were in no actual fault either for not knowing their left wheel was on the left side of the

centre of the road, or for not knowing they were approaching the plaintiff's wagon."

The common-law rule which "generally imposes liability for actual fault only" and which "nowhere" has "been more clearly and decisively declared than in this jurisdiction, *Brown* v. *Collins*, 53 N. H. 442," (*Carleton* v. *Railroad*, 82 N. H. 263, 266) has been regarded as decisive in the construction of other statutes. *Carleton* v. *Railroad, supra; Jarvis* v. *Claremont*, 83 N. H. 176, 180.

Considering the motor vehicle law in the light of these fundamental principles the conclusion seems plain that the legislature did not intend to impose criminal liability for "an act which a man does not intend to commit, of which he is unconscious, and for which he is in fact blameless," (*Lyons* v. *Child, supra*) or, to reinstate the discredited doctrine of liability without fault. "In this situation, it would be natural to expect that any legislative reinstatement of the old theory of liability would be expressed in explicit terms." *Carleton* v. *Railroad, supra.*

The language of the statute above quoted reinforces this conclusion. By its terms, the owner of a motor vehicle who shall "permit" an unlicensed person to operate it is guilty of a criminal offense. The word "permit" ordinarily implies knowledge of and consent to the thing permitted. See numerous illustrative cases collected in "Words and Phrases" under the heading "Permission—Permit," and 48 C. J. 924.

Undoubtedly the plaintiff permitted Heartz to perform the physical acts required in the operation of her car. It does not follow that she consented to his violation of the statute. Such consent depended upon her knowledge of his unlicensed status, of which we must assume that she was justifiably ignorant. It is not illegal for the owner of a motor vehicle to permit another person to drive it. This is all that the plaintiff knowingly did. To hold that in making this unforbidden arrangement she acted at her peril and took the risk that other facts unknown to her might render her conduct illegal, would be contrary not only to the fundamental principle of natural justice set forth above, but to the ordinary meaning of the words of the statute.

The statutory rules for the construction of statutes provide that "words and phrases shall be construed according to the common and approved usage of the language." P. L., c. 2, s. 2; *Colston* v. *Railroad*, 78 N. H. 284; *Floyd* v. *Verrette*, 79 N. H. 316. Some reason of compelling force would be necessary to justify a conclusion that the legislature attached to the word "permit" any meaning not in accord with the common and approved usage of the language.

It is argued that such a reason is found in the purpose of the statute which, as declared in *Johnson* v. *Railroad, supra,* is "to protect other users of the highways," (*Ib.,* 351); that since the protection of travelers was the legislative purpose, an interpretation of the statute which gives the greatest possible protection should be adopted.

One answer to this argument is that it proves too much. It asserts that a statute designed for an ascertainable purpose should be given the most drastic possible interpretation in order to accomplish that purpose in its widest possible extension. Judged by this standard, the cases of *Lyons* v. *Child* and *Carleton* v. *Railroad, supra,* were wrongly decided and the long line of cases involving the liability of towns for defective highways beginning with *Hubbard* v. *Concord,* 35 N. H. 52, would be subject to the same reproach. We do not recognize in this argument an accepted canon of construction. In the recent case of *Davis* v. *Company, ante,* 204, this court explained at length why such an argument could not be adopted.

Logically this argument is fallacious in at least two respects. First, it involves an equivocation in regard to the purpose of the legislature. While it may safely be assumed that the purpose of the statute was to give protection to other users of the highway, it by no means follows that the greatest possible protection was intended. The legislature undoubtedly intended to give such protection as the act provided. It begs the question to make a further assumption in regard to the extent of the designed protection and then to construe the language of the statute so as to give effect to that assumption.

Second, bearing in mind the nature of our problem, *i.e.* the ascertainment of the intent of the legislature from the language used in the statute, the above argument describes a complete circle. In outline it is as follows: The statute was passed because the legislature intended to give travelers the greatest possible protection from unfit drivers and it intended to give travelers the greatest possible protection from unfit drivers because the statute was passed.

It has been suggested that the plaintiff should be charged with knowledge of the driver's unlicensed status because she did not demand that he show a license before permitting him to drive her car. It is argued that an obligation to make such a demand is a necessary corollary of the statutory provision that an operator shall have his license on his person or in an easily accessible place in the motor vehicle. The provision to which reference is thus made reads as follows: "Every person operating a motor vehicle shall have the certificate of registration for said vehicle and his license to operate

upon his person or in the vehicle in some easily accessible place."
P. L., c. 101, s. 16. The conclusion that this section was intended
to be supplemental to section 9 and was designed to specify the
method which car owners must adopt in ascertaining whether another
person holds a license, finds little support in the language quoted and
still less in the history of the law. This provision had its origin in
Laws 1905, c. 86, s. 4, which provided as follows: "Every licensee
when operating a machine shall keep his license with him and exhibit
it upon the request of any officer of the law." The language of the
present statute was adopted in Laws 1911, c. 133, s. 10. The express
command that the license be exhibited "upon the request of any
officer of the law" was in that act transferred to another section
(s. 21), and now appears in section 19 of chapter 102 of the Public
Laws, but the obvious purpose of this section as enacted in 1905 was
not thereby altered. The requirement that a person operating a
motor vehicle shall have his license readily accessible is designed
primarily to facilitate identification and investigation in case he is
involved in an accident upon the highway. Other sections of the act
sustain this conclusion. P. L., c. 101, ss. 4, 6; Ib., c. 102, ss. 17, 19.
There is nothing to indicate that it was designed to impose by in-
direction upon every owner of a motor vehicle a specific duty to de-
mand the production of a license, before permitting another person
to operate his car.

The practice of car owners to allow friends to drive their cars is
undoubtedly common, but it is not common to demand of a friend
that he show his license before permitting him to drive. It would
come as a violent surprise to most car owners to be told that such a
demand is required by the statute and is the only sure way of avoid-
ing a criminal prosecution. We do not think that the language of
section 16 above quoted demands or permits a construction so con-
trary to the amenities of life in a civilized community.

The foregoing considerations lead to the conclusion that the ques-
tion transferred by the Superior Court must be answered in the nega-
tive and it is so ordered.

*Case discharged.*

PAGE, J., was absent: ALLEN, C. J., dissented: the others concurred.

ALLEN, C. J., *Dissenting.* In my opinion the decision in this case

is wrong. It seems to me to be reached through a control of the common law over a statute when the statute should control the common law. It is true that the inquiry what the legislature has ordered may be answered by the application of common-law principles tending to give force to the legislative policy and objectives, and it is true that no policy should be extended beyond its intended range of enforcement (*Young* v. *Bridges*, 86 N. H. 135; *Davis* v. *Company*, *ante*, 204); but common-law principles are to be employed to aid in the search for the declaration of intention, and not to derogate from it. In *Young* v. *Bridges*, *supra*, 140, 143, the view was taken: "... all legislation shall be fairly construed according to its evident purpose. *Faulkner* v. *Keene*, 85 N. H. 147, 154, 155; *Mulhall* v. *Company*, 80 N. H. 194; *Clough* v. *Railroad*, 77 N. H. 222, 230. ... The purpose of a statute to except certain cases from its terms is not ordinarily shown merely by reasons of expediency and justice when the policy involved is wholly legislative."

It is readily admitted that a declared policy may not go so far in its operation and enforcement as to include extreme applications. There may be a conflict with other policies so that adjustment with them is required. But if the applications are found to be within the policy, it involves no illogical or circuitous reasoning to reach the finding.

The theory of the majority opinion that "compelling force" is necessary for a reason to give language a special meaning seems to overstate the sufficiency of the reason. The statute (P. L., *c. 2, s. 2*) is only partially quoted in support of the theory. Such words "as may have acquired a peculiar and appropriate meaning in law, shall be construed" accordingly (*Ib.*). In my opinion it unduly narrows the established principle of statutory construction so forcibly stated in *Opinion of the Justices*, 66 N. H. 629, 661, as follows: " 'The language of a statute is not to be construed according to technical rules, unless such be the apparent meaning of the legislature. Therefore many cases, not expressly named, may be comprehended within the equity of a statute; the letter of which may be enlarged or restrained, according to the true intent of the makers of the law.' *Whitney* v. *Whitney*, 14 Mass. 88, 92, 93. 'In some cases, the letter of the statute may be restrained by an equitable construction; in others, enlarged; and sometimes the construction may be even contrary to the letter.' *Pierce* v. *Emery*, 32 N. H. 484, 508, .... 'Instances without number exist where the meaning of words in a statute has

been enlarged, or restricted and qualified, to carry out the intention of the legislature. The inquiry, where any uncertainty exists, always is as to what the legislature intended, and when that is ascertained it controls.' *Eureka, etc., Mining Co.* v. *Richmond Mining Co.*, 4 Saw. 302, 316, 317. 'There is probably no jurisdiction in which a legislative purpose is carried into effect by a more liberal mode of construction than that which prevails in this state. But the most liberal construction is nothing more than the ascertainment of that purpose from competent evidence.' *Boston, Concord & Montreal Railroad* v. *Railroad,* 65 N. H. 393, 399.''

The statute here considered, having a protective purpose, is of a remedial character, and "is to be construed liberally in order to 'fully and adequately effectuate the purpose of its enactment'." *Mulhall* v. *Company,* 80 N. H. 194, 199. Nothing is said in *Davis* v. *Company, ante,* 204, which modifies these tests. As therein stated, the language of a statute is to be given its ordinary and popular meaning, but provided the legislative policy is thereby upheld. It seems unfortunate that a rule should now be laid down by which words must have their ordinary meaning unless the conclusion that a special meaning is to be given is inescapable and irresistible. A fair balance of argument and probability is all that has heretofore been considered necessary.

If there could be no civil liability here short of the commission of an offense against the state, the majority opinion concedes that an act may be criminal regardless of intent. The occasion for holding intent not to be an element of the offenses considered in the cited cases of *State* v. *Cornish,* 66 N. H. 329, and *State* v. *Ryan,* 70 N. H. 196, may well be thought less important than in the statute here involved. But it is not demanded that such a position be taken. The argument to which a substantial part of the majority opinion is devoted and which advances the proposition that if the plaintiff violated the statute in any respect, the violation was of a criminal character, does not seem valid.

The criminal liability may not cover all cases of breach of the civil duty. An offense against the state may properly require knowledge of the unlicensed status of the driver as an element of the offense, while a breach of the civil duty may not.

When one obtains goods on credit with intent not to pay for them, it is a civil fraud. *Gitterman* v. *Company,* 87 N. H. 335, 337, and cases cited. "The intent not to pay is a material fact" (*Stewart* v. *Emerson,* 52 N. H. 301, 320), and there is a false pretense as to an existing state of mind. But as a crime, although dishonesty abounds,

there is no such pretence. *State* v. *King*, 67 N. H. 219; *State* v. *Shevlin*, 81 N. H. 121.

In *Dubreuil* v. *Waterman*, 84 Conn. 47, the penal provisions of a statute allowing punitive damages were construed with "reasonable strictness," in contrast with those providing for the actual damage. "Statutes may be in part penal, and in part remedial. Statutes which provide a penalty recoverable by the party aggrieved are in many cases construed as remedial as well as penal, and, in dealing with them, courts are called upon to some extent to make application of two adverse principles, viz., strict construction on account of the penalty, and liberal construction to prevent the mischief sought to be deterred and to advance the remedy thereby given in favor of the party aggrieved." *Lagler* v. *Bye*, 42 Ind. App. 592. "A statute may be penal in one part and remedial in another (Suth., St. Const. *s.* 208, and cases cited) and in such case, when it is sought to enforce the penalty, it is to be construed as a penal statute; and when it is sought to enforce the civil remedy provided, it is to be construed as remedial in its nature." *Gardner* v. *Railroad*, 17 R. I. 790.

The violation of traffic signals and rules may not be an offense when unintentional, but may yet be a breach of civil duty even if there is no purpose to commit the forbidden act.

In brief, a statute in regulating a particular subject may set up different standards of conduct in respect to criminal and civil liability.

It is not clear whether by the majority opinion the statute is held to impose any civil duty upon the car owner in giving permission to another to drive if the owner has no actual knowledge of his unlicensed status. As the decision is understood, there is none. The evidence tended to show that the plaintiff reasonably believed the driver to be licensed. But no finding of such a belief has been made, and yet the decision is that the driver's lack of license is no bar to recovery. In other words, whether the plaintiff's belief was reasonable, is immaterial. All that she needs to show is her ignorance. But if this view misinterprets the decision, and reasonable belief of a licensed status is essential, then the opinion concedes the existence of a civil duty the violation of which, according to the view herein expressed, may not be punishable.

Some civil duty not to permit an unlicensed person to drive exists. If the owner knows the driver to be unlicensed, the situation is the same as in the case of *Johnson* v. *Railroad*, 83 N. H. 350. Without knowledge of the status on the part of the owner, the duty in my opinion presupposes some obligation to undertake to ascertain what

the status is. The right to permit is not fairly to be determined by an arbitrary test of lack of knowledge of an unlicensed status, as it seems to me. Some inquiry is demanded. In ignorance of the status the owner may not rightly be excused for inaction and indifference. If the duty to inquire is performed, the right to permit is given. The information thereby gained may be erroneous and the owner mistaken. No claim is made that the owner permits at peril. The duty of inquiry is not to obtain information which must be correct, and the liability is not absolute in character.

What the duty of inquiry is, remains to be determined. Normally reasonable inquiry, such as the ordinary person in the owner's place would make, would be sufficient. But there is a statute (P. L., c. 101, s. 13) ordering that an operator have his certificate of license on his person or in an easily accessible place in the motor vehicle. It contemplates that he shall be in readiness to produce his certificate on any proper occasion. An owner who permits another to drive without first requiring that the certificate be shown does not take advantage of a simple, definite, expedient, practical, and effective means of information. If production of the certificate is not requested or if one is not produced upon request, the owner should fairly be held to take the risk of a license being in force. No hardship upon the owner is perceived. His permission for another to drive is voluntary and optional. If he takes information which may or may not be reliable in place of that which is practically certain, he should not be heard to complain that his information was mistaken. He should be held to be under a duty to gain the information in the manner for which the statute provides, as a requirement of the statute. It being illegal to permit an unlicensed person to drive and a means of ascertainment being pointed out by the statutory arrow, it seems a disregard of the statute to hold that it does not direct that the means be employed. Required to permit only licensed persons to drive, one should be required, in learning whether they are licensed, to follow the statutory guide.

It is no novelty of legislation to lay down a specific rule of conduct in place of a generalized standard not having definite precision of application. And explicitness of language therefor is not required. Inexplicitness is the chief reason for the need of construction.

The suggestion that the view here taken conflicts with the principle of many cases of which *Lyons* v. *Child*, 61 N. H. 72, *Carleton* v. *Railroad*, 82 N. H. 263, and *Hubbard* v. *Concord*, 35 N. H. 52, are cited as examples, is not thought to be well grounded. All that is con-

tended for is that the legislature has prescribed a duty of conduct in place of the rule of due care. Just as in negligence anticipation of consequences may be a duty, so here to seek information in a certain manner is considered to be prescribed. It is not the permission to one not known to be unlicensed that is by itself wrongful, but it is the failure to adopt means specially provided for by the statute and adapted to disclose the unlicensed status that makes the permission seemingly a breach of statutory duty.

In some analogy, in the operation of a motor vehicle, "Liability without fault is not imposed, and infallibility is not required." But "the operator . . . must take every precaution that reason suggests. Merely doing what the ordinary man might think sufficient is not the test." *Carleton* v. *Railroad*, 82 N. H. 263, 267. This applied to a special statute demanding special conduct. A new fault was created superseding common-law fault. So here, although the new fault is not so specifically declared in precise statement, the rule that one should take certain action conveniently and readily at hand may fairly be found to take the place of the rule that "what the ordinary man might think sufficient" establishes the standard of conduct. It would seem that a rule of proper conduct in place of one of reasonable conduct might be found without doing violence to sensibilities of respect for the standard of ordinariness, in view of the occasion for conduct better than the ordinary.

If the certificate of license is misleading, by reasons such as forgery or alteration or by suspension or revocation of the license, then the owner, having acted according to the statutory mandate, may properly permit the holder of the certificate to drive. The fallibility of the certificate should not be chargeable to the owner. The statute requires no more of him than that he pursue the directed course.

The argument that the statute requiring the holder of a license to have the certificate with him does not correlate with the duty not to permit unlicensed persons to drive, does not seem impressive. In the first motor vehicle legislation (Laws 1905, c. 86) there is no specific provision forbidding permission to unlicensed persons to drive. Such persons might not be employed for hire as chauffeurs or operators (*Ib.*, s. 5), and the implication would seem to be that the owner was under no restrictions as to others. This legislation proved to be inadequate and was generally revised in 1911 by an act (Laws 1911, c. 133), which in turn underwent revision in 1921. By the legislation then enacted (Laws 1921, c. 119) the provision against permission now in force was first expressly adopted (*Ib.*, s. 8). At that time

and by the legislation (*Ib., s.* 9) the certificate of license was required to be at the licensee's hand. No purpose of so having it is stated in the section, in contrast with such statement in the 1905 law, nor was any purpose stated in the 1911 law. The inference seems clear that it was to be exhibited on any proper occasion. As a practical matter, if the licensee does not choose to show his license, he should not be permitted to drive. In any fair view of the legislation, the certificate was to be generally available. Its design and availability for certain purposes should not limit it to them. And it should be taken into account that the legislation upon the subject of motor vehicle operation was in its early stages experimental and required progressive changes from time to time, so that its present state should not be very rigorously determined by its early enactments.

It is said in the majority opinion that the court in the *Johnson* case "carefully refrained from expressing an opinion upon" the question here in issue. But also in the case it is said that "the legislature has dealt with the questions of remoteness, materiality and moral accountability in a practical way." *Johnson v. Railroad,* 83 N. H. 350, 360. This language is broad enough to be inclusive of liability without specific intent to do wrong. And the rule here proposed is more consonant with the general reasoning of the *Johnson* case than the rule of the majority opinion.

Since the *Johnson* case there have been four regular legislative sessions. No change in the statute as therein interpreted has been made, while at one session a bill to amend the statute by making the common-law rule of causation applicable to it was defeated. The interpretation which the case makes has thus received legislative sanction. Remoteness and immateriality not being sufficient reasons for relief from liability, consistency, in due regard of the purpose of the statute and under its reasonable construction, is believed to demand that avoidable ignorance should also be found to be within its coverage.

If any subject needs regulation, it is that of motor vehicle operation. In 1906 motor vehicles were said to "have introduced a new and serious peril to travelers upon highways" (*Emerson &c. Co. v. Pearson,* 74 N. H. 22, 23). The newness has worn off, but not the seriousness. It is not a matter of argument. It is a matter of important concern to all who use the highways. I do not agree that a civilized community may not countenance the view herein taken and I am unprepared to ascribe to the legislature a purpose to exalt the amenities of polite intercourse above the protection of life and limb.

"Moreover, it is matter of common knowledge that more rather than less restriction upon motor vehicle operation is needed for the protection of the traveling public." *Johnson* v. *Railroad, supra,* 362.