IN THE MATTER OF SOL J. COHEN, AN ATTORNEY AT LAW OF NEW JERSEY.

Decided November 24, 1952.

For the order, *Mr. Frederick C. Vonhof.*

For the respondent, *Mr. Sol J. Cohen, pro se.*

PER CURIAM. The Essex County Ethics and Grievance Committee, by two presentments dated June 20, 1952 and

October 28, 1952, presented for disciplinary action Sol J. Cohen, an attorney admitted in 1931. Orders to show cause issued upon both presentments.

Mr. Cohen by answer to the written charges which are the subject of the first presentment admitted the allegations of the charges that in or about December 1946 he "did wilfully and knowingly participate and aid in the procurement of an illegal and void 'mail order' Mexican divorce purportedly severing the bonds of matrimony" of Jesse V. Geiger and Mary Bakic Geiger; and that in May 1948 he did also "wilfully and knowingly participate and aid in the procurement of an illegal and void 'mail order' Mexican divorce purportedly severing the bonds of matrimony" of Mary Schlausky and Michael Schlausky, Jr.

That Mexican mail order divorce decrees obtained merely on signed waivers of jurisdiction without the personal appearance in Mexico of either husband or wife are complete nullities in this State has long been settled. *Reik v. Reik,* 109 *N. J. Eq.* 615 (*Ch.* 1932); affirmed 112 *N. J. Eq.* 234 (*E. & A.* 1933); *Knapp v. Knapp,* 12 *N. J. Misc.* 599 (*Ch.* 1934); *Newton v. Newton,* 13 *N. J. Misc.* 613 (*Ch.* 1935); *Greenspan v. Greenspan,* 19 *N. J. Misc.* 153 (*Ch.* 1941). Decisions since 1946 include *Tonti v. Chadwick,* 1 *N. J.* 531 (1949) and *State v. Najjar,* 2 *N. J.* 208 (1949), affirming 1 *N. J. Super.* 208 (*App. Div.* 1949).

On December 19, 1942 the Committee on Professional Ethics and Grievance of the American Bar Association promulgated Opinion No. 248 expressing the Committee's view that it is unethical conduct on the part of a lawyer to participate or aid in the procurement of admittedly illegal Mexican divorces. Opinion No. 248 was reprinted in full in the January 31, 1946 issue of the *New Jersey Law Journal,* 69 *N. J. L. J.* 38. The opinion was adopted by the Ethics Committee of the New Jersey State Bar Association and is reported in the Association's 1946 *Year Book,* at *page 71.*

For the guidance of the bar,—we condemn as unethical the participation of a lawyer in, or his giving aid to, the

procurement of such mail order divorces. Future conduct in this regard will particularly be deemed sufficient basis for the taking of severe disciplinary measures.

Mr. Cohen, however, has been guilty of flagrant transgressions which, apart from his actions in obtaining the Mexican decrees, merit severe discipline.

On January 25, 1950 Mr. Cohen brought an annulment action on behalf of Jesse V. Geiger in the Superior Court against Mary Bakic Geiger on the ground of his non-age at the time of this marriage, but, contrary to the requirement of *Rule* 3:84–1, did not include in the complaint mention of the Mexican decree as a "previous proceeding between the parties, respecting the marriage, or its dissolution."

Mary Bakic Geiger had married George Nicholas after the Mexican divorce. George Nicholas filed a complaint in the Superior Court for annulment of that marriage on the ground of the invalidity of the Mexican decree. On December 13, 1950, the advisory master hearing the Nicholas case caused Mr. Cohen to come before him, and the following colloquy ensued:

"The Court: Mr. Cohen, you are here for several reasons. It has been disclosed to the Court that you were counsel in connection with the Geiger Mexican divorce, is that so?

Mr. Cohen: That is not so. The people came to me in reference to getting a determination of their married status, and I told them then they could sue for annulment in New Jersey, and they were quite in a hurry, although why, I don't know. They wanted to dispose of their marital status and end it quickly. They said they heard something about foreign divorce decrees. I told them they could go to Florida and submit to foreign jurisdiction, but that I didn't handle that work, and I practiced in New Jersey.

The Court: And you now state for the record, Mr. Cohen, you did not represent them in connection with their Mexican divorce?

Mr. Cohen: I did not represent them in connection with their Mexican divorce. I learned later on they did get a Mexican divorce.
\*    \*    \*    \*    \*    \*    \*    \*

By the Court: Mr. Cohen, did you ever have any knowledge concerning the alleged Mexican divorce?

Mr. Cohen: Not until much later on.

By the Court: When?

Mr. Cohen; Shortly subsequent to the institution of the annulment suit.

By the Court: Which annulment suit?

Mr. Cohen: Jesse V. Geiger *vs.* Mary B. Geiger, Docket M-2421-49."

\*      \*      \*      \*      \*      \*      \*      \*

Mr. Cohen: Both Mr. and Mrs. Geiger were at my office. They mentioned the Mexican divorce, and I told them I didn't handle Mexican divorces.

The Court: That's not true, Mr. Cohen, You do handle Mexican divorces. Do you recall the case of Schlausky *vs.* Schlausky?

Mr. Cohen: That name is familiar to me.

By the Court: Didn't you procure a Mexican divorce for them and weren't you paid $300.00 in connection with that?

Mr. Cohen: I think that is right.

By the Court: Then why do you tell me you don't handle Mexican divorces?

Mr. Cohen: I don't, but I think in that case there was a good reason for the procurement of it."

The advisory master continued the matter to February 15, 1951, when the following colloquy took place:

"By the Court: What was the status of the matter at the last hearing?

Mr. Cohen: Your Honor, the last time we were before you, December 13, 1950, in answer to Your Honor's question concerning a certain Mexican divorce, I stated to Your Honor, for the record, that I did not recall assisting in the procurement of such a divorce.

Upon returning to my office and searching my records, I find I did assist Mr. Jesse Geiger in procuring a Mexican decree of divorce, to which proceedings, his then wife, Mrs. Geiger consented, in that she signed a Power of Attorney or proxy, consenting to the Mexican decree of divorce, and submitted to the jurisdiction of a foreign tribunal.

I make this statement so the record may be clear, and correct any ambiguity that may exist."

\*      \*      \*      \*      \*      \*      \*      \*

The Court: One of the reasons you were asked to be present today is that in that particular Geiger suit, if my memory serves me right, under the rules counsel is supposed to set forth in the Complaint any previous suits between the parties, which means any suit, anywhere, as I understand the law. That particular Geiger suit did not contain any reference to the previous suit. That is, the Mexican decree.

Mr. Cohen: That is correct, Your Honor, and it should be corrected.

The Court: That is one reason that you were requested to be here. The other reason was that the testimony in the case of George Nicholas *vs.* Mary Geiger, also known as Mary Nicholas disclosed that you had represented the Geigers, that is Jesse V. Geiger, who is the plaintiff in a suit before this Court, and who is also, I understand the plaintiff in the Mexican suit between Jesse Geiger and Mary Gei-

ger, who is the defendant in the Nicholas *vs*. Geiger or Nicholas suit. The testimony in the Nicholas suit disclosed that you had represented the Geigers in the procurement of the Mexican decree. The Court desires to know under what circumstances the omission of the Mexican suit was made in the Geiger *vs*. Geiger suit.

That, together with your remarks at the last hearing held under date of December 13, 1950, leads the Court to believe that some explanation from you is required."

\*          \*          \*          \*          \*          \*          \*          \*

The Court: I do not desire at this time to take up the question of the legality of the Mexican divorce, although I have my personal opinion as to its validity.

Yet, Mr. Cohen, knowing of this previous Mexican divorce, and representing the same party again in the New Jersey suit of Geiger vs. Geiger, Docket M-2421-49, filed in 1949, why wasn't reference made to the Mexican decree?

Mr. Cohen: That is my mistake, and I ask leave of the Court to include that reference in the proceedings. It is not the fault of Mr. Geiger, but it is my fault, and should be included. There was no intention on my part to withhold the information from the Court, and Your Honor will recall, when Your Honor wrote to me, I did not shirk or dodge on appearance. I was here each and every time. Since I failed to incorporate it, I ask permission of the Court to incorporate it at this time in the pleadings.

The Court: I believe you may do so by filing the necessary papers to amend for that purpose."

A judgment of annulment was entered on June 18, 1951 in George Nicholas' action against Mary Bakic Geiger Nicholas, but Jesse V. Geiger's complaint against her, as amended, was dismissed by order entered November 2, 1951.

Mr. Cohen's conduct before the advisory master on both December 13, 1950 and February 15, 1951 was completely lacking in that candor and fairness which Canon 22 enjoins upon the lawyer before the court. On February 15, 1951 he represented that it was only after the hearing on December 13 that he learned from the search of his records that he had in fact assisted the Geigers in obtaining their Mexican decree, intimating that until he made the search he had forgotten the matter. We cannot reconcile this representation with his positive statements on December 13, 1950, that he "did not represent them in connection with their Mexican divorce" and only "learned later on that they

had got a Mexican decree," namely, "subsequent to the institution of the annulment suit" in the Superior Court, brought by him for Mr. Geiger. Moreover, his omission to mention the Mexican decree in the complaint for annulment, explained only as "my mistake," buttresses our conclusion that his statements to the advisory master on both occasions were knowingly false.

In addition, Mr. Cohen's conduct in his defense of the order to show cause before this court must similarly be characterized as unprofessional and unethical and demonstrative of his lack of the character for truth and candor to be expected of an officer of the court charged with the duty of aiding the administration of justice. He secured successive extensions of the return day of the order, the first for three weeks and the second for two weeks, upon representations of his desire to retain counsel and to prepare and submit a brief. He was explicitly instructed on the second occasion that his brief must be submitted to the court not later than the Thursday preceding the Monday set for argument. This was not done, but on the argument he stated that the brief was then in the hands of a printer and would be available to the court within a day. He identified the printer. Inquiry of the concern he named disclosed that not only was the concern not printing a brief for Mr. Cohen but that it was not in the business of printing briefs. When asked at a subsequent oral argument where the briefs were, his statement was that he burned them after receiving them from the printer.

The second presentment charges Mr. Cohen with a failure to account to a client for moneys due and owing to the client. Mr. Cohen did not formally answer the charges admittedly served upon him by the Ethics and Grievance Committee, nor, although duly notified, did he appear at the hearing held by the committee.

Mr. Cohen was retained by a client in 1942 to secure a workmen's compensation award. The client was about to be inducted into military service. A settlement upon the claim

was reached and was approved by a Deputy Commissioner of the Bureau of Workmen's Compensation. This was three days before the client was inducted into military service. The compromise entitled the client to the sum of $500, and Mr. Cohen was allowed a fee of $100 for his services, payable $40 by the client and $60 by the employer. Because of the imminence of the client's induction into service he gave Mr. Cohen, at the latter's suggestion, a power of attorney to endorse any check received in payment of the compromise, with the understanding that Mr. Cohen would forward the balance due to the client. A draft in the amount of $500 payable to the client and bearing the date of the day of the client's induction into service was received by Mr. Cohen. Mr. Cohen endorsed the draft in the client's name under the power of attorney and also in his own name. The draft was cashed on the day of its date by a bank at which Mr. Cohen maintained an account. The client testified that while in military service he wrote Mr. Cohen and once while on furlough personally visited him to ask for his money and was told by Mr. Cohen that the case had been placed on the military list. Upon the client's discharge from service in 1945 and again in 1946 he inquired of Mr. Cohen as to the status of his case and was told "that it would take quite some time for the case to come up because there were so many compensation cases and the courts could not take care of the number that had to be re-opened." The client testified that he had no occasion to question this as the newspapers at the time reported that the compensation bureau was "years behind." He stated this was the reason "why I let it go as long as I did." It was not until some time in 1952 that when "casually talking with the insurance man that sells me all my fire insurance", the insurance agent offered to find out from his employer's insurance company how the case stood. The inquiry made by the insurance agent disclosed the payment of the draft in 1942.

Mr. Cohen's defense on the oral argument was that in 1942 he took a job in a war plant to qualify for exemption

from induction into military service and left the conduct of his practice to others employed in his office, giving only general supervision of it for short periods after working hours. He disclaimed any recollection of the matter and said he had no file with respect to it. He supposed some person, not identified, then employed in his office, whose present whereabouts he did not know, had handled it. He first suggested that his signature in endorsement of the draft might be a facsimile, but later admitted that it was genuine. He thought he may have executed the endorsement as a matter of routine on an occasion when he visited his office after his work day.

His explanation does not have the ring of truth. It impresses us as mere evasion. And he left wholly unanswered and uncontradicted the testimony of his client as to the number of occasions upon which Mr. Cohen put him off with the excuse that the case had not yet been reached on the trial list.

We find that Mr. Cohen abused and took advantage, for his own personal benefit, of the confidence reposed in him by a client, thus violating Canon 11.

The majority of the court is of the opinion that Mr. Cohen's name should be stricken from the roll.

*For disbarment*—Chief Justice VANDERBILT, and Justices OLIPHANT, BURLING, JACOBS and BRENNAN—5.

*For suspension for two years*—Justices HEHER and WACHENFELD—2.