STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
JOHN De MEO, DEFENDANT-APPELLANT.

Argued October 10, 1955—Decided November 14, 1955.

2

*Mr. Charles L. Bertini* argued the cause for the appellant.

*Mr. Myron W. Kronisch,* Legal Asst. Prosecutor, argued the cause for the respondent (*Mr. Charles V. Webb, Jr.,* Prosecutor of Essex County, attorney).

The opinion of the court was delivered by

JACOBS, J. The Appellate Division affirmed the defendant's conviction for bigamy. 35 *N. J. Super.* 168. Thereafter he sought certification under *R. R.* 1:10–2 but his application was denied by this court. *State v. De Meo,* 19 *N. J.* 330 (1955). He also filed notice of appeal alleging that his constitutional right to trial by jury had been impaired. See *R. R.* 1:2–1(*a*). The State filed a motion to dismiss the appeal and decision thereon was reserved pending full argument which has been completed.

In 1941 the defendant married Ann Nasco De Meo and in 1953 he married Josephine De Pasque. Both marriages took place in New Jersey, all parties are still alive, and no intervening final judgment of divorce was ever granted in the United States. However, the defendant's application for license to marry Josephine De Pasque stated that he had been divorced by a Mexican decree dated February 18, 1953. He was indicted for bigamy and was duly tried before County Judge Waugh and a jury. During the trial Ann Nasco De Meo testified that her marriage to the defendant had never been annulled and that she had never obtained a final judgment of divorce although she had received a Mexican decree in the mail; she testified further that a document bearing her signature and apparently used as a power of attorney in the Mexican proceeding had been obtained from her by the defendant who had her sign a blank piece of paper.

Counsel for the defendant stated that he was not contending that Ann Nasco De Meo ever went to Mexico and he represented that he did not intend to establish that there was ever any domicil in Mexico. However, he did offer in evidence an exemplified copy of a divorce decree issued under date of February 18, 1953 by the First Civil Court, Bravos District, State of Chihuahua, in a proceeding entitled Ann Nasco DeMeo, plaintiff, v. John DeMeo, defendant. This decree did not purport to rest on any jurisdictional finding of domicil; on the contrary it simply asserted that the plaintiff had appeared by a special attorney and filed a suit for divorce and that the court acquired jurisdiction "by the submission of the plaintiff to the authority of this Court." Judge Waugh declined to receive the Mexican decree in evidence. See *State v. Najjar*, 1 *N. J. Super.* 208 (*App. Div.* 1949), affirmed 2 *N. J.* 208 (1949). He did permit the introduction of the defendant's application for a license to marry Josephine De Pasque; as hereinbefore noted, the application made specific reference to the Mexican divorce. *Cf. Antunes v. Antunes*, 23 *N. J. Super.* 150 (*Law Div.* 1952). The defendant did not testify in his own behalf.

In his charge to the jury, Judge Waugh clearly explained the State's burden of establishing the elements of the crime of bigamy and the defendant's presumption of innocence which remained "with him throughout the entire trial of the case." He quoted the main body of our statute (*N. J. S.* 2A:92-1) which declares that "any person who, having a husband or wife living, marries another person, is guilty of bigamy," and then set forth the statutory exceptions including the one in favor of a person who had been "divorced by the judgment or decree of any authority or court having cognizance thereof." He instructed the jury that domicil was the jurisdictional basis for divorce and that the burden of bringing himself within the statutory exception rested with the defendant. See *State v. Reilly*, 88 *N. J. L.* 104 (*Sup. Ct.* 1915), affirmed 89 *N. J. L.* 627 (*E. & A.* 1916). After the jury returned its verdict of guilty, the defendant appealed to the Appellate Division asserting

various trial errors; these were rejected in a persuasive opinion by Judge Goldmann. *State v. De Meo*, 35 *N. J. Super.* 168 (1955). As we view the issues presented to and determined by the Appellate Division there were no constitutional questions involved which are reviewable in this court as of right under *R. R.* 1:2–1(*a*). In *Starego v. Soboliski*, 11 *N. J.* 29, 32 (1952), *State v. Pometti*, 12 *N. J.* 446, 450 (1953), and *State v. Greenberg*, 16 *N. J.* 568, 571 (1954), we recently pointed out that an appeal under the cited rule is maintainable only where the record reveals a substantial rather than merely a colorable constitutional question. Since we perceive no substantial constitutional question in the instant matter we shall grant the State's motion to dismiss the appeal. However, in view of the important public nature of the matter we shall deal further with the questioned effects of Mexican mail order divorces. See *Starego v. Soboliski, supra; City of Newark v. Pulverman*, 12 *N. J.* 105, 108 (1953); *State v. Monahan*, 15 *N. J.* 34, 36 (1954); *State v. Greenberg, supra.*

██ Domicil is generally said to be the place where the person maintains his permanent home. See *Kurilla v. Roth*, 132 *N. J. L.* 213, 215 (*Sup. Ct.* 1944); *State v. Garford Trucking, Inc.*, 4 *N. J.* 346, 353 (1950). *Cf.* 1 *Beale, Conflict of Laws* 89 *et seq.* (1935). It is the jurisdictional basis for divorce and is recognized as such in all of our states and throughout the English-speaking world. *State v. Najjar, supra.* Without it no state may properly grant a divorce; with it any state may grant a divorce which would be entitled to recognition elsewhere under the full faith and credit clause. See *Williams v. State of North Carolina* (I), 317 *U. S.* 287, 63 *S. Ct.* 207, 87 *L. Ed.* 279 (1942); *Stultz v. Stultz*, 15 *N. J.* 315, 319 (1954); *Zieper v. Zieper*, 14 *N. J.* 551, 559 (1954). *Cf. Lea v. Lea*, 18 *N. J.* 1 (1955); *Williams v. State of North Carolina* (II), 325 *U. S.* 226, 65 *S. Ct.* 1092, 89 *L. Ed.* 1577 (1945); *Sherrer v. Sherrer*, 334 *U. S.* 343, 68 *S. Ct.* 1087, 92 *L. Ed.* 1429 (1948); *Johnson v. Muelberger*, 340 *U. S.* 581, 71 *S. Ct.* 474, 95 *L. Ed.* 552 (1951); *Sutton v. Leib*, 342 *U. S.* 402, 72 *S. Ct.* 398, 96

*L. Ed.* 448 (1952) ; *May v. Anderson*, 345 *U. S.* 528, 73 *S. Ct.* 840, 97 *L. Ed.* 1221 (1953).

▉ The Mexican divorce of February 18, 1953 was not based on domicil or any jurisdictional finding thereof; assuming for present purposes that it may have some validity in Mexico itself (*cf. Summers, The Divorce Laws of Mexico, 2 Law and Contemporary Problems* 310 (1935) ), it clearly has no extraterritorial effect and is entitled to no recognition here. See *Tonti v. Chadwick*, 1 *N. J.* 531 (1949) ; *State v. Najjar, supra; In re Cohen*, 10 *N. J.* 601 (1952). In the *Tonti* case the court held that a Mexican mail order divorce was "utterly void for want of jurisdiction of the subject matter"; in the *Najjar* case a bigamy conviction, based on a remarriage after a similar divorce, was sustained and the divorce was described as "legally void and generally known to be worthless"; and in the *Cohen* case this court said in an opinion which disbarred an attorney on charges including his participation in the procurement of a Mexican mail order divorce :

"That Mexican mail order divorce decrees obtained merely on signed waivers of jurisdiction without the personal appearance in Mexico of either husband or wife are complete nullities in this State has long been settled. *Reik v. Reik*, 109 *N. J. Eq.* 615 (*Ch.* 1932), affirmed 112 *N. J. Eq.* 234 (*E. & A.* 1933) ; *Knapp v. Knapp*, 12 *N. J. Misc.* 599 (*Ch.* 1934) ; *Newton v. Newton*, 13 *N. J. Misc.* 613 (*Ch.* 1935) ; *Greenspan v. Greenspan*, 19 *N. J. Misc.* 153 (*Ch.* 1941). Decisions since 1946 include *Tonti v. Chadwick*, 1 *N. J.* 531 (1949) and *State v. Najjar*, 2 *N. J.* 208 (1949), affirming 1 *N. J. Super.* 208 (*App. Div.* 1949)." (10 *N. J.* at page 602)

Our most recent expression on the subject is found in *Untermann v. Untermann*, 19 *N. J.* 507 (1955), where Justice Oliphant aptly stated that "whatever doubt there may have existed in the minds of some over the years that a Mexican divorce might have some validity in this State was completely dissipated when this case was filed in 1953." The defendant De Meo does not now contend that the divorce of February 18, 1953 has any validity in this State; his position is that the exemplified copy of the Mexican divorce should have been admitted, not to establish that he was legally

divorced, but as evidence tending to support a defense that he acted in good faith and without any intention of violating the bigamy statute. In *State v. Najjar, supra,* this court held that a defendant who remarries on the basis of a Mexican mail order divorce (which lacks even colorable validity) may not avail himself of a defense based on the absence of criminal intent. The defendant De Meo urges that the *Najjar* case be re-examined and that our bigamy statute now be construed as affording a comprehensive defense based on the defendant's honest belief that he was free to remarry. See *Clark and Marshall, Crimes* (*5th ed.* 1952), 60, 63; *Trowbridge, Criminal Intent and Bigamy,* 7 *Calif. L. Rev.* 1 (1918); *Edwards, Mens Rea and Bigamy,* 2 *Current Legal Problems* 47 (1949).

Originally bigamy was an offense against canon law, triable only in the ecclesiastical courts. Although mentioned in the Statute de Bigamis in 1279, it did not become a crime cognizable in common-law courts until the passage of 1 *Jac.* 1, *c.* 11 (1603). See *State v. Warady,* 78 *N. J. L.* 687, 691 (*E. & A.* 1910); 2 *Wharton's Criminal Law* (*12th ed.* 1932), § 2030; 3 *Burdick, Law of Crime* (1946), § 841. The present English act was passed in 1861 and provides that "whoever being married, shall marry any other person during the life of the former husband or wife shall be guilty of felony"—there then follow exceptions in cases (1) where the other spouse has been absent for seven years and is not known to be alive, (2) where there has been a divorce, and (3) where the first marriage has been declared void by a court of competent jurisdiction. See Offences Against the Person Act, 1861 (24 & 25 *Vict., c.* 100, § 57).

In *Reg. v. Tolson,* [1899] 23 *Q. B. D.* 168, the defendant went through a ceremony of marriage within seven years after she had been deserted by her husband. She had been advised that her husband had been lost in a vessel which went down with all hands on board and the jury found that when she entered into her second marriage she, in good faith and on reasonable grounds, believed her husband to be dead. The court held that the defendant had a defense to the

charge of bigamy and that her conviction by the trial court was erroneous. However, in *R. v. Wheat*, [1921] 2 *K. B.* 119, the court held that it was no defense to an indictment for bigamy that the defendant believed, in good faith and on reasonable grounds, that he had been divorced prior to his second marriage. Justice Avory, in his opinion for the Court of Criminal Appeal, sought to distinguish *Reg. v. Tolson, supra,* and stressed that the statute contained no indication that good faith was a defense but merely set forth that the prohibition against remarriage should not apply where the party had "in fact been divorced from the bond of the first marriage." The distinctions which have been drawn between *Tolson* and *Wheat* are not at all convincing but neither decision has been discarded. See *Edwards, supra,* 61; *Thomas v. The King,* 59 *Comm. L. R.* 279 (*Australia* 1937).

██ In the United States the weight of authority rejects *Tolson* and is in accord with *Wheat.* See *State v. Najjar, supra,* 1 *N. J. Super.* at *page* 213; *Commonwealth v. Mash,* 7 *Metc.* 472, 48 *Mass.* 472 (*Sup. Jud. Ct.* 1844); *People v. Spoor,* 235 *Ill.* 230, 85 *N. E.* 207 (*Sup. Ct.* 1908); *State v. Goonan,* 89 *N. H.* 528, 3 *A. 2d* 105 (*Sup. Ct.* 1938); *People v. Kelly,* 32 *Cal. App. 2d* 624, 90 *P. 2d* 605 (*Ct. App.* 1939); *Alexander v. United States,* 78 *U. S. App. D. C.* 34, 136 *F. 2d* 783 (*D. C. Cir.* 1943); *State v. Hendrickson,* 67 *Utah* 15, 245 *P.* 375, 57 *A. L. R.* 786 (*Sup. Ct.* 1926); *Turner v. State,* 212 *Miss.* 590, 55 *So. 2d* 228 (*Sup. Ct.* 1951); *Burdick, supra,* § 849; *Clark and Marshall, supra,* § 41; *Wharton, supra,* §§ 2075–2078; *Clark's, Criminal Law* (*3rd ed.* 1915), 409; 7 *Am. Jur.* 764 (1937); 10 *C. J. S., Bigamy,* § 7, *p.* 367 (1938); 57 *A. L. R.* 792 (1928). The American cases recognize that since the crime is statutory the Legislature is free to require or omit guilty knowledge as an element thereof; as Justice Swayze put it in *State v. Kuehnle,* 85 *N. J. L.* 220, 225 (*E. & A.* 1913), "The Legislature may, if it will, make an act criminal without regard to the criminal intent; the question is, Has it done so?" ⌠See *State v. Labato,* 7 *N. J.* 137, 149 (1951); *State v. Tracy,* 29 *N. J.*

*Super.* 145, 152 (*App. Div.* 1953), certification denied 15 *N. J.* 79 (1954); *Halsted v. State,* 41 *N. J. L.* 552, 589 (*E. & A.* 1879). In the *Halsted* case Chief Justice Beasley stated that "the maxim that crime proceeds only from a criminal mind" does not universally apply to statutory offenses and that in any event the defendant could not plead "that he was ignorant of the law as applied to the facts involved in his conduct." In *State v. Western Union Telegraph Co.,* 12 *N. J.* 468, 493 (1953), appeal dismissed 346 *U. S.* 869, 74 *S. Ct.* 124, 98 *L. Ed.* 379 (1952), this court, through Justice Wachenfeld, recently restated the principle that ignorance of a law is no defense to an indictment for its violation and remarked that "a contrary doctrine would spell chaos and an impossibility of law enforcement." See *State v. Pruser,* 127 *N. J. L.* 97, 101 (*Sup. Ct.* 1941); *State v. Atti,* 127 *N. J. L.* 39, 44 (*Sup. Ct.* 1941), affirmed 128 *N. J. L.* 318 (*E. & A.* 1942). *Cf. Hall, Principles of Criminal Law* 323 *et seq.* (1947).

In *Commonwealth v. Mash, supra,* the defendant remarried several years after her husband had deserted her. When her first husband reappeared she was indicted and convicted for bigamy and appealed on the ground that the trial court had erroneously instructed the jury that the defendant's honest belief that her first husband was dead constituted no legal defense. In sustaining the conviction, Chief Justice Shaw construed the bigamy statute of Massachusetts as excluding a defense based on good faith; he expressed the oft-quoted view "that in a matter of this importance, so essential to the peace of families and the good order of society, it was not the intention of the law to make the legality of a second marriage, whilst the former husband or wife is in fact living, depend upon ignorance of such absent party's being alive, or even upon an honest belief of such person's death." In *People v. Spoor, supra,* the defendant was tried for bigamy and sought to prove that when he remarried he honestly, though mistakenly, thought that his first wife had obtained a valid divorce from him. The trial court excluded the proffered testimony and its action was sustained by the

Illinois Supreme Court which said [235 *Ill.* 230, 85 *N. E.* 208]:

"While it is true that there is authority to the effect that belief in information as to the divorce or death of the former wife, when acted on cautiously and circumspectly and without fault, has been held to relieve one from the criminal intent of a second marriage (*Bishop on Statutory Crimes* [3d ed.] §§ 596a, 596b, 608; *Queen v. Tolson*, 8 *Am. Crim. Rep.* 59), yet we think that the decided weight of authority in this country holds that proof of the fact that the second marriage was entered into in good faith, under an honest, but mistaken, belief that the first wife was dead or had obtained a divorce, constitutes no defense to the charge of bigamy (4 *Elliott on Evidence,* §§ 2871, 2872). Where a legal divorce, granted before the second marriage, is offered as a defense, the burden is on the defendant to prove the validity of the decree. 4 *Elliott on Evidence,* § 2873."

In *State v. Hendrickson, supra,* the Utah Supreme Court rejected a defense based on the defendant's honest belief that his first wife had obtained a divorce; the court took the position that the matter was entirely one of statutory construction and found that "there was no exception in the statute, nor were there any words which might imply that good faith or honest intention in doing the prohibited act could be interposed as a defense." [67 *Utah* 15, 245 *P.* 378.] Similarly, in *State v. Goonan, supra,* the New Hampshire Supreme Court sustained the exclusion of testimony that the defendant mistakenly believed that he had obtained a default divorce; in the course of his opinion Justice Marble said [89 *N. H.* 528, 3 *A. 2d* 106]:

"In this jurisdiction the question whether criminal intent is a necessary element of a statutory offense is one of statutory construction (*Coutremarsh v. Metcalf*, 87 *N. H.* 127, 175 *A.* 173; *Bowdler v.* [*St. Johnsbury*] *Trucking Co.*, 88 *N. H.* 331, 332, 189 *A.* 353), and the enumeration in Section 6 of the defences to which a person charged with the crime of bigamy is entitled would, on the general principles governing such construction, exclude all others. *Howe v. Howe*, 87 *N. H.* 338, 340, 341, 179 *A.* 362. See, also, *People v. Spoor*, 235 *Ill.* 230, 232, 85 *N. E.* 207, 126 *Am. St. Rep.* 197, 14 *Ann. Cas.* 638; *State v. Hendrickson*, 67 *Utah* 15, 23, 245 *P.* 375, 57 *A. L. R.* 786. In short, had it been the intention of the Legislature to include in the list of exceptions any person entertaining a reasonable belief that he has been legally divorced, it is unlikely, in view

of 'the public concern for the stability of marriage' (*Heath v. Heath*, 85 *N. H.* 419, 428, 159 *A.* 418, 422), that such legislative purpose would have been left to implication. See *Pffefferkorn v. Lewis*, 80 *N. H.* 518, 520, 119 *A.* 368.

'In the case of the second exception there is no indication in the statute that any presumption or belief is to afford any defence; the words do not admit of any such qualification and the only defence under this head appears to be that the accused has in fact been divorced from the bond of the first marriage. If he has not, then at the time of the second marriage he is a person who, being married, intends to do the act forbidden by the statute—namely, "to marry during the life of the former wife." ' *The King v. Wheat*, [1921] 2 *K. B.* 119, 125."

The strict liability which the weight of authority in this country imposes has been justified as being in fulfillment of the strong public policy in favor of marriage stability; but since it may harshly result in the criminal conviction of persons who are not morally culpable it has understandably received severe criticism in academic circles. See *Hall, supra*, 371; *Clark and Marshall, supra*, 66; 1 *Bishop, Criminal Law* (*9th ed.* 1923), 210–213. Professor Hall suggests that the paramount fact is not that bigamy is a statutory offense but that the penalty therefor is severe and he urges that "a *mens rea, e. g.*, entry into a marriage with knowledge of an existing binding union," should always be required. But even the courts which have expressed disagreement with the weight of authority have declined to go that far in endangering bigamy prosecutions by permitting a defense based on subjective belief without accompanying objective safeguards. In *Alexander v. United States*, 78 *U. S. App. D. C.* 34, 136 *F. 2d* 783, 784 (*D. C. Cir.* 1943), the trial court refused to charge the jury that the defendant should be acquitted if, at the time of his remarriage, he believed that his first wife had secured a divorce from him; instead, it charged that if the defendant's first marriage had not been dissolved by a valid decree of a competent court then the defendant should be found guilty. On appeal, the Court of Appeals for the District of Columbia referred to the majority rule as a harsh one and stated that, in a proper case, it would be slow to hold a remarriage to be criminal where the defendant's

information was such "that a reasonable person, after an honest and thorough investigation, would have been justified in remarrying in reliance on it." It pointed out, however, that "even in those states taking the minority position it is necessary that the accused have made a *bona fide* and diligent effort to ascertain the true facts"; after reviewing the evidence which disclosed that there had been no such effort the court unanimously affirmed the defendant's conviction for bigamy.

In the recent case of *Long v. State,* 5 *Terry* 262, 65 *A. 2d* 489, 497 (*Del. Sup. Ct.* 1949), commented upon in 62 *Harv. L. Rev.* 1393 (1949); 35 *Va. L. Rev.* 644 (1949); 25 *Ind. L. J.* 86 (1949), the defendant left Delaware for Arkansas in 1946; he was a retired police officer in bad health and testified that he intended "to leave Delaware permanently and take up a permanent domicile in Arkansas." While in Arkansas he instituted divorce proceedings and a decree of divorce was entered in 1947. The defendant then returned to Delaware and thereafter remarried. He was indicted for bigamy and found guilty by a jury. The trial court had rejected evidence from which the jury might have found that prior to his remarriage the defendant had consulted a reputable Delaware attorney to whom he made full and fair disclosure of the relevant circumstances and who advised him that he was legally free to remarry. The Supreme Court of Delaware held that the evidence should have been admitted and remanded the cause for a new trial. It stated that it would recognize ignorance or mistake of law as a defense where the defendant had acted in good faith and before engaging in his conduct had "made a *bona fide,* diligent effort, adopting a course and resorting to sources and means at least as appropriate as any afforded under our legal system, to ascertain and abide by the law." It acknowledged that its recognition of the defense, even as thus safeguarded, might have some deterrent effects upon the administration of the criminal law but expressed the view that they were "greatly outweighed by considerations which favor allowing it." *Cf. State v. Cutter,* 36 *N. J. L.* 125 (*Sup. Ct.* 1873); *Lutwin v.*

*State,* 97 *N. J. L.* 67 (*Sup. Ct.* 1921); *State v. Satsky,* 4 *N. J. Misc.* 335 (*Sup. Ct.* 1926).

 New Jersey's bigamy statute is similar to most of the bigamy statutes now in force in the United States. See *N. J. S.* 2*A*:92–1. It first provides that any person who, having a husband or wife living, marries another is guilty of bigamy and shall be punished as for a high misdemeanor. It then states that it shall not extend to (1) a person whose spouse shall remain continuously outside the United States for a period of five years; (2) a person whose spouse shall absent himself or herself for a period of five years, the party remarrying being ignorant that his or her spouse was then living; (3) a person who at the time of remarriage shall be divorced by the judgment or decree of any authority or court having cognizance thereof; and (4) a person whose former marriage has been declared void by such court or authority. The statutory language is broad and contains no express reference to criminal intent; if the majority view throughout the country is adhered to in all its rigor, then a defendant's mistaken belief that he was legally divorced prior to his remarriage constitutes no defense even though he be fully prepared to establish that he acted in good faith after diligently having taken reasonable precautions. On the other hand if the more humane minority view is found acceptable, then a contrary result may readily be reached in our State as a matter of statutory construction; as Justice Heher has said, that which is properly implied is as much part of our statutory law as that which is expressed. *Brandon v. Board of Comm'rs of Town of Montclair,* 124 *N. J. L.* 135, 143 (*Sup. Ct.* 1940), affirmed 125 *N. J. L.* 367 (*E. & A.* 1940). In *Cutter ads. State, supra,* our former Supreme Court, in construing a statute as impliedly requiring that corrupt intent be shown as an element of the crime charged, said in an opinion by Chief Justice Beasley:

"In morals it is an evil mind which makes the offence, and this, as a general rule, has been at the root of criminal law. The consequence is that it is not to be intended that this principle is discarded, merely on account of the generality of statutory language. It is

highly reasonable to presume that the law makers did not intend to disgrace or to punish a person who should do an act under the belief that it was lawful to do it. And it is this presumption that fully justifies the statement of Mr. Bishop, 'that a statute will not generally make an act criminal, however broad may be its language, unless the offender's intent concurred with his act.' 1 *Crim. Law*, § 80."

While much more may perhaps be said for the minority view and the moral considerations which support it, we consider that, in any event, it has no proper application to the particular circumstances presented in the instant matter. The defendant De Meo knowingly remarried on the basis of a Mexican mail order divorce. He has not at any time suggested that he remarried under a factual misapprehension or that he took reasonable steps towards ascertaining the legal validity of the divorce; indeed, if such steps had been taken they would quickly have disclosed its utter worthlessness. *State v. Najjar, supra,* which in 1949 affirmed a bigamy conviction for remarriage after a Mexican mail order divorce clearly described the futility of such divorces and quoted from *Caldwell v. Caldwell,* 298 *N. Y.* 146, 81 *N. E.* 2d 60, 63 (1948), where the New York Court of Appeals had noted that "the legal profession and, indeed, the general public now recognize the valueless character of mail order divorces." Following *Najjar* the Legislature in 1951 (*N. J. S.* 2A:92–1) re-enacted our bigamy statute without change and the time is long past when a defendant may justly be heard to say in our courts that he reasonably and honestly held the belief that he was free to remarry on the basis of a Mexican mail order divorce. We now reaffirm the sweep of *Najjar* in striking down Mexican mail order divorces for all purposes in bigamy prosecutions. However, as was done in *Najjar,* we expressly withhold determination as to the availability "in situations not before us" (1 *N. J. Super.* at *page* 214) of a defense to a bigamy prosecution resting upon the defendant's honest belief, reasonably entertained, that he was legally free to remarry in New Jersey.

The appeal is dismissed.

WACHENFELD, J. (dissenting). The basic question here is whether in a bigamy prosecution good faith reliance upon a judgment of divorce which in law is void is still a valid defense.

In *State v. Najjar*, 1 *N. J. Super.* 208 (*App. Div.* 1949), affirmed *per curiam* 2 *N. J.* 208 (1949), the court held that ignorance of the law in such a situation was no excuse and so long as the defendant knew all the facts and his marriage was in purported reliance upon a decree legally void and generally known to be worthless, the defendant was guilty.

The court cited and relied upon *State v. Long*, 5 *Terry* 251, 44 *Del.* 251, 59 *A. 2d* 545 (*Del. Gen. Sess.* 1948), as setting forth the general rule to that effect. Actually, *State v. Long* was reversed by the Delaware Supreme Court, *sub nom. Long v. State*, 5 *Terry* 262, 44 *Del.* 262, 65 *A. 2d* 489 (1949), on the very point for which it was cited. The reversal came after the opinion by the Appellate Division but before our decision of affirmance, although I doubt whether it was called to our attention.

I voted for affirmance in the *Najjar* case, *supra*, but further study and consideration bring me to the conclusion that I was in error.

A final judgment of divorce, even where the judgment is void and even though it is generally known to be worthless, unless this general knowledge is imputed or brought home to the defendant, should constitute a defense in a criminal action of bigamy. The defendant's intent and the query as to whether or not he acted under a genuine mistake of law go to the very heart of our concept of criminal behavior and become part of the *mens rea* which is a fundamental in our criminal law. The crime of bigamy, like any other crime, at least those where the Legislature has not specifically excluded the element of criminal intent in defining the crime itself, requires a guilty mind and an intent to do wrong.

Not only is this the law, but it seems to be an inseparable part of human nature and the foundation of fundamental fairness, as is reflected by the inquiry of the jury in the case at hand. After deliberating, they returned and asked:

"1. Could the jury return a verdict of not guilty if through infer-
ence it believes that the defendant firmly believed himself to be
divorced at the time of his second marriage?
2. Should the jury consider the defendant's intent to commit a
crime?"

I think the court's answer to the first question was fair
and intelligent. Its answer to the second was an evasion
and in conflict with the answer first given.

Because we have vigorously frowned upon Mexican divorces
in our adjudications on foreign edicts brings with it no reason
why we should assume that everyone is as cognizant as
lawyers and judges are of the discredit and disrepute in which
these decrees are held. There is nothing in our divorce law
which neutralizes or changes the doctrine we have always
adhered to, that a wrongful act and a wrongful intent must
concur before a criminal penalty falls.

Mr. Average Citizen who, as he did here, submits to one of
the major state departments his application for a marriage
license and sets forth therein in full that he was divorced by
a Mexican divorce decree, giving its date and the court which
granted it, has a right to assume he can utilize the very
license issued by the state without going to jail for having
done so.

It must come as a distinct shock to an honest person who
has made full disclosure to his sovereign state as to his exact
marital status and secured a license to embark upon another
matrimonial venture to find that without wrongful or criminal
intent he automatically becomes a convict on a criminal
charge which he cannot even defend because the court refuses
to accept the very evidence he relied upon and which was,
inferentially at least, approved by the state itself at the time
he made his original intentions known. Such a result is not
good law, and his incarceration cannot conceivably be synony-
mous with that kind of justice which we so proudly proclaim.

There is much in the learned opinion of the majority sup-
porting this view.

I would reverse the conviction for these reasons.

OLIPHANT, J., concurring in result.

*For dismissal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—6.

*For reversal*—Justice WACHENFELD—1.