EMANUEL ZIEPER, PLAINTIFF-RESPONDENT, v. REBECCA ZIEPER, DEFENDANT-APPELLANT.

Argued January 25, 1954—Decided March 1, 1954.

552

*Mr. J. Mortimer Rubenstein* argued the cause for the appellant.

No appearance for respondent.

The opinion of the court was delivered by

HEHER, J. We have here the question of the validity of a final judgment granted June 6, 1949, by the Superior Court of the State of California, in and for the County of Los Angeles, following an interlocutory judgment entered May 28, 1948, dissolving the marriage between these parties litigant, Emanuel Zieper and Rebecca Zieper, in a suit brought by the wife on October 30, 1947.

The complaint in the California action accused Emanuel of "cruel and inhuman" treatment, the infliction of "great and grievous mental and physical pain, suffering and anguish," and desertion; and the judgment was entered by default, for want of an appearance and answer. The complaint alleged plaintiff's residence in California for more than one year prior to the commencement of the action, and in the County of Los Angeles for more than three months preceding the commencement of the action.

Service of process upon the absent husband in the California action was made by publication and mailing; and thereafter, on November 25, 1947, the husband instituted suit in the old Court of Chancery of New Jersey to enjoin the prosecution of the California action for divorce. An *ad interim* restraint was granted; and the wife was directed to show cause on January 9, 1948, why the restraint should not continue *pendente lite*. There was substituted service of process upon the wife, by registered mail and personal service in California, but there was no appearance.

The gravamen of the complaint was falsity in the wife's allegation of residence in California, and thus a willful fraud upon the California court which inhered in the jurisdiction and would vitiate a judgment for divorce thereafter entered. And the wife was charged with willful, continued and obstinate desertion and a separation from the established "matrimonial domicile" in New Jersey, ineffectual because against the will of her husband, and therefore a feigned residence in California to induce the grant there of a divorce "for an alleged cause which occurred while the parties were *bona fide* residents of and domiciled" in New Jersey, in disregard of *R. S.* 1937, 2:50–35, now *N. J. S.* 2A:34–22. A decree *pro confesso* was entered April 26, 1948, but the wife nevertheless prosecuted her California suit to final judgment. Thereafter, on June 25, 1949, a final decree was entered in the New Jersey suit adjudging that the wife's interlocutory judgment of divorce in the California action "was procured by fraud and imposition" as to residence practiced by the wife upon the California court, in that the wife "was and still is domiciled" in New Jersey, and the "marital status" of the parties "has always been and now is subject to the jurisdiction" of the New Jersey courts, and so the interlocutory judgment of divorce "is null, void and of no force or effect" in New Jersey. There was a continuance of the restraint against the prosecution of the California action for divorce, and as well "any other proceedings against" the husband for divorce "or involving the matrimonial status" of the parties, either in California "or else-

where other than in" New Jersey; and "any final judgment of divorce" then or thereafter entered in the California suit was decreed "to be null, void and of no force or effect" in New Jersey.

In the current New Jersey action, commenced October 27, 1949, Emanuel seeks a divorce for Rebecca's willful, continued and obstinate desertion since the separation in January 1947. Rebecca answered denying the desertion thus laid to her, countered with an allegation of Emanuel's desertion of her "while both were residents" of California, and its willful and obstinate continuance, and, by counterclaim, pleaded in separate counts the California judgment of divorce, its subsistence and validity, and Emanuel's desertion of her on January 20, 1947, and prayed for a dissolution of the marriage, custody of the child, and support and maintenance for herself and the child. Emanuel's answer to the counterclaim challenged the validity of the California divorce on jurisdictional grounds, and pleaded the New Jersey injunction against prosecution of the California action and the subsequent judgment in that proceeding purporting to nullify the California divorce.

Emanuel was awarded judgment *nisi* for divorce in this suit, and there was a dismissal of Rebecca's counterclaim save that she was given custody of the child and an allowance for the child's support. Rebecca appealed. The Appellate Division divided. The majority found "testimony persuasively evidential of the deceit intentionally practiced upon the California court" by Rebecca "in obtaining her judgment of divorce in that jurisdiction," presumably in relation to the jurisdictional domicil, and therefore the divorce is not entitled to recognition in New Jersey. Each of the parties was absolved of the charge of obstinate desertion; the judgment *nisi* for divorce was reversed, and there was an affirmance of the dismissal of Rebecca's counterclaim as to her "individually," and the allowances to her for the support of the child and the services of counsel were sustained. But Judge Bigelow was of the opinion the California divorce was invulnerable. 25 *N. J. Super.* 500 (*App. Div.* 1953). Thus,

the case is here on Rebecca's appeal of right under the 1947 Constitution. *Article* VI, *Section* V, *paragraph* 1(*b*). Emanuel did not appear on either appeal.

 The basis of jurisdiction to dissolve the matrimonial status is domicil, or at least residence *animus manendi*; and the dissolution of marriage is governed by the *lex domicilii*. The Full Faith and Credit Clause of the Federal Constitution, *Article* IV, *Section* 1, implemented by 28 *U. S. C. A.*, § 1738, formerly § 687, enjoins extraterritorial acceptance of a decree of divorce obtained in keeping with the requirements of procedural due process by a spouse who had acquired a *bona fide* domicil in the state in which the divorce was granted, even though the spouse against whom the decree was entered had remained in the state of the original matrimonial domicil and had neither appeared nor been served with process in the state in which the divorce proceeding was instituted and recognition of such a divorce would offend the policy of the former state. *Hollander v. Hollander,* 137 *N. J. Eq.* 70 (*E. & A.* 1945); *Tonti v. Chadwick,* 1 *N. J.* 531 (1949); *Peff v. Peff,* 2 *N. J.* 513 (1949); *Robison v. Robison,* 9 *N. J.* 288 (1952); *Williams v. North Carolina,* 317 *U. S.* 287, 63 *S. Ct.* 207, 87 *L. Ed.* 279 (1942); *Bell v. Bell,* 181 *U. S.* 175, 21 *S. Ct.* 551, 45 *L. Ed.* 804 (1901).

 Such is the exposition of the Full Faith and Credit Clause by the supreme federal interpretative authority. The constitutional protection does not extend to judgments of the courts of sister states not invested with jurisdiction either of the subject matter or of the person of the defendant. The Full Faith and Credit Clause comes into operation only when "the jurisdiction of the court in another state is not impeached, either as to subject matter or the person"; a decree of divorce "is a conclusive adjudication of everything except the jurisdictional facts upon which it is founded, and domicil is a jurisdictional fact"; and, while the issue of jurisdiction, once settled "after appropriate opportunity to present their contentions has been afforded to all who had an interest in its adjudication," cannot after a contest be

relitigated between the parties, "those not parties to a litigation ought not to be foreclosed by the interested actions of others," and the state "of domiciliary origin should not be bound by an unfounded, even if not collusive, recital in the record of a court of another State." *Williams v. North Carolina*, 325 *U. S.* 226, 65 *S. Ct.* 1092, 89 *L. Ed.* 1577 (1945); *Thompson v. Whitman*, 18 *Wall.* 457, 21 *L. Ed.* 897 (1874); *Mills v. Duryee*, 7 *Cranch.* 481, 3 *L. Ed.* 411 (1813). For the requirements of full faith and credit where the defendant participated in the divorce proceedings and was afforded full opportunity to contest the jurisdictional issues, see *Sherrer v. Sherrer*, 334 *U. S.* 343, 68 *S. Ct.* 1087, 1089, 1097, 92 *L. Ed.* 1429 (1948); *Coe v. Coe*, 334 *U. S.* 378, 68 *S. Ct.* 1094, 92 *L. Ed.* 1451 (1948). And compare the later case of *Rice v. Rice*, 336 *U. S.* 674, 69 *S. Ct.* 751, 93 *L. Ed.* 957 (1949).

 The historical view that a suit for divorce is altogether a proceeding *in rem* is no longer entertained. But it is not a mere *in personam* action. It is not an "ordinary adversary proceeding," to use the words of Mr. Justice Frankfurter in the second *Williams* case, cited *supra*. Domicil of the plaintiff, of no significance to jurisdiction in a personal action, is yet requisite to jurisdiction which will entitle the divorce decree to extraterritorial effect, at least when the defendant has neither been personally served with process nor entered an appearance. Although not the original matrimonial domicil, the domicil of the plaintiff gives rise to a relationship to the state which is adequate for numerous exercises of state power, and judicial dissolution of the marriage is not an exception. Said Mr. Justice Douglas in the first *Williams* case: "Each state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders. The marriage relation creates problems of large social importance. Protection of offspring, property interests, and the enforcement of marital responsibilities are but a few of commanding problems in the field of domestic relations with which the state must deal"; and so "it is plain that each state by

virtue of its command over its domiciliaries and its large interest in the institutions of marriage can alter within its borders the marriage status of the spouse domiciled there, even though the other spouse is absent. There is no constitutional barrier if the form and nature of the substituted service meet the requirements of due process. * * * The existence of the power of a state to alter the marital status of its domiciliaries, as distinguished from the wisdom of its exercise, is not dependent on the underlying causes of the domestic rift," but rather "on the relationship which domicil creates and the pervasive control which a state has over marriage and divorce within its own borders." *Williams v. North Carolina*, 317 *U. S.* 287, 63 *S. Ct.* 207, 87 *L. Ed.* 279 (1942). "Divorce, like marriage, is of concern not merely to the immediate parties. It affects personal rights of the deepest significance. It also touches basic interests of society. Since divorce, like marriage, creates a new status, every consideration of policy makes it desirable that the effect should be the same wherever the question arises." *Williams v. North Carolina*, 325 *U. S.* 226, 65 *S. Ct.* 1092, 89 *L. Ed.* 1577 (1945).

The Full Faith and Credit Clause "puts the Constitution behind a judgment instead of the too fluid, ill-defined concept of 'comity'"; but it "does not make a sister-state judgment a judgment in another state * * *. 'To give it the force of a judgment in another state, it must be made a judgment there.' * * * It can be made a judgment there only if the court purporting to render the original judgment had power to render such a judgment. A judgment in one state is conclusive upon the merits in every other state, but only if the court of the first state had power to pass on the merits—had jurisdiction, that is, to render the judgment." *Williams v. North Carolina*, 325 *U. S.* 226, 65 *S. Ct.* 1092, 89 *L. Ed.* 1577 (1945).

And even though the pleaded cause of action be not entertainable in the state of the forum, either because it had been barred by the local statute of limitations or was obnoxious to local policy, the judgment thereon obtained in

a sister state is entitled to full faith and credit. *Williams v. North Carolina*, 317 *U. S.* 287, 63 *S. Ct.* 207, 87 *L. Ed.* 279 (1942); *Christmas v. Russell*, 5 *Wall.* 290, 18 *L. Ed.* 475 (1866); *Titus v. Wallick*, 306 *U. S.* 282, 59 *S. Ct.* 557, 83 *L. Ed.* 653 (1939). The "very purpose" of the Full Faith and Credit Clause was "to alter the status of the several states as independent sovereignties, each free to ignore obligations created under the laws or by the judicial proceedings of the others, and to make them integral parts of a single nation." *Milwaukee County v. M. E. White Co.*, 296 *U. S.* 268, 276, 56 *S. Ct.* 229, 80 *L. Ed.* 220 (1935).

And where a husband against whom a wife had obtained in New York a decree of separation with maintenance became domiciled in Nevada, and there obtained a divorce in a suit of which the defendant wife was given notice by constructive service, but in which she did not appear, and the decree made no provision for alimony, although the court was informed of the separate maintenance decree, and the wife sought enforcement of the maintenance decree in the New York courts, the Federal Supreme Court held that, though the divorce decree was entitled to full faith and credit in New York in respect of marital status, it was ineffective on the issue of alimony, and so the New York judgment remained enforceable against the husband. The rationale of the holding is that the New York judgment "is a property interest * * * created by New York in a proceeding in which both parties were present," giving rise to rights and obligations, and the property interest thus created "was an intangible, jurisdiction over which cannot be exerted through control over a physical thing," but only "from control or power over the persons whose relationships are the source of the rights and obligations," and to read the Nevada decree as extinguishing all claim for alimony under the New York judgment would be "to exercise an *in personam* jurisdiction over a person not before the court," and a judgment of a court without jurisdiction is not within the constitutional principle. *Estin v. Estin*, 334 *U. S.* 541, 68 *S. Ct.* 1213, 92 *L. Ed.* 1561, 1 *A. L. R. 2d.* 1412 (1952).

Compare *Esenwein v. Pennsylvania,* 325 *U. S.* 279, 65 *S. Ct.* 1118, 89 *L. Ed.* 1608, 157 *A. L. R.* 1396 (1945). See, also, *Klaiber v. Frank,* 9 *N. J.* 1 (1952).

The burden of overcoming the California court's finding of a marital status in that jurisdiction has not been sustained. Involving as it does the element of a present intention to establish a *bona fide* habitation for an unlimited and indefinite period, permanent rather than temporary, *animus manendi* and *animus non revertendi, Kurilla v. Roth,* 132 *N. J. L.* 213 (*S. Ct.* 1944), the matrimonial domicil or residence is elusive when the inquiry is directed to the period of Emanuel's military service.

Before the marriage, Emanuel resided in New Jersey and Rebecca in New York, at their respective family homes. After the marriage, celebrated May 1, 1942 at Columbia, South Carolina, where the husband was then stationed at an Army post, they took residence nearby and lived there together for a month, when the wife returned to her parents' home in New York City, and there remained with brief intermittent absences to be in the company of her husband, her husband joining her meanwhile in New York City when furloughs permitted, until his discharge from the Army on December 2, 1945. This was in accordance with the husband's wishes and necessities. His military assignments were uncertain and covered a wide area, and home life together was out of the question. He was on occasion at military stations in Tennessee, Missouri and California, and she made visits to him at the latter two, in Missouri while he was undergoing hospitalization after an accident. And for 18 months he was overseas. Upon his return to civilian life, cohabitation was resumed at the home of the wife's parents; some two or three weeks later, they went to Paterson, New Jersey, and lived with his sister at her apartment there for but four days, leaving when the sister's husband returned from military service. Residence in Paterson was then under consideration, but nothing came of it. Satisfactory living quarters within their means were not to be had; and they returned once again to the home of the wife's

parents, and there cohabited together until the Fall of 1946, when the parents purchased a dwelling in Los Angeles, California, and established their home and domicil there. The parents went to California in September, 1946; Rebecca and the child, born August 29 preceding, joined her parents there the following month, Emanuel consenting, it is clear, though he now denies consent. He followed his wife and child to Los Angeles in November, in fulfillment of an understanding had at the time of the wife's departure, under circumstances unmistakably indicating a common intention to establish their domicil there, though he now insists his purpose was merely "to visit." After the parents left for Los Angeles, Emanuel and his family remained at the parents' home in New York City until his wife and child departed for California; and upon his arrival at Los Angeles cohabitation was resumed at the parents' home there. He took employment as a trolley conductor in Los Angeles, and they continued living there together until January 1947, when he quit work and went off to the home of his kinfolk in Paterson, New Jersey.

Emanuel insists that his wife, though not directly refusing, would not make her home with him in Paterson, and finally suggested a divorce. But he failed to provide living quarters there, even on an occasion when she was, he conceded, disposed to yield to his importunities. No doubt, there were mounting emotional tensions and pressures; but the primary cause of their difficulty, it is reasonably certain, was his unwillingness or inability to adjust himself to his altered circumstances and assume the responsibilities of the marriage state. He admitted that upon discovery of her pregnancy, his wife told him she was for that reason averse to a divorce; yet he did not visit or communicate with her for "six or seven months" of the period of pregnancy, and made no contribution to her support. And he said that before the final separation in Los Angeles he "asked her if she wanted to come back to Paterson," but she gave him "no answer," and then he "came back." But they had never lived together in Paterson, except on the four-day visit with his sister;

they had not had a home or domicil there; he did not thereafter communicate with his wife, directly or indirectly; he did not evince a disposition to provide a home there for her and the child. Indeed, the contrary mood is well nigh an irresistible inference. For quite some time after his return to Paterson he worked at "odd jobs," in New Jersey and New York, the while living with his sister in Paterson. He said he was unable to "get a steady job." He contributed to the support of his child, but it would seem that this was under pressure exerted by the District Attorney of Los Angeles County.

The Appellate Division found that Emanuel "originated" the "last separation," and "by his voluntary departure terminated the marital cohabitation"; that he had "never provided a home of his own from which it may be said that either departed," and had acknowledged that never after the separation had he "exerted any effort whatever to communicate" with his wife, and there is no proof that "the failure" of the wife "to cohabit" with the husband was obstinate. We concur in these findings.

But matrimonial fault is not the determinative consideration on the present inquiry, for on the merits of the pleaded cause of action the California judgment for divorce is conclusive if there was jurisdiction of the subject matter and of the person; and it is abundantly clear that the matrimonial domicil was established in California and continued there until the husband's voluntary separation from his wife, and thereafter her domicil was there until she returned to New York City with her parents in June 1949, the parents, repenting of their change of domicil, having disposed of their home in Los Angeles and reestablished their domiciliary residence in New York City. There was not here a bare temporary change of residence to create the semblance of the domicil essential to jurisdiction—a mere pretense of the jurisdictional residence to work a fraud upon the California court.

And the operative force of this constitutional principle is not conditioned by the New Jersey rule adverted

to in *Shepherd v. Ward*, 5 *N. J.* 92, 106, that upon marriage the domicil of the wife "merges into that of her husband \* \* \* and this unity of domicile, called the matrimonial domicil, exists during coverture unless the wife acquires one elsewhere by the husband's consent, manifested by acquiescence, or abandonment, or by his *delictum*." For otherwise the jurisdictional domicil would depend, not on the *bona fide* domiciliary residence of the wife, but rather on the husband's guilt of a *delictum* or matrimonial offense, measured by New Jersey standards; and this would do violence to the full faith and credit concept delineated in the *Williams* cases. "A *feme covert's* residence follows that of her husband, but terminates with the reason upon which it rests, and when the union between the two ceases, and an attitude of hostility arises, they may each have different residences," *Tracy v. Tracy*, 62 *N. J. Eq.* 807 (*E. & A.* 1900). And *California Civil Code, section* 129, provides that in actions for divorce "neither the domicile nor residence of the husband shall be deemed to be the domicile or residence of the wife," but for the purposes of such an action "each may have a separate domicile or residence depending upon proof of the fact and not upon legal presumptions." We are concerned here, not with State policy, but with overriding federal law. Domicil as a prerequisite to jurisdiction entitling a divorce to faith and credit under the constitutional mandate is essentially a question of federal and not state law. Compare *Rice v. Rice*, cited *supra; Cook v. Cook*, 342 *U. S.* 126, 72 *S. Ct.* 157, 96 *L. Ed.* 146 (1951); *Sutton v. Leib*, 342 *U. S.* 402, 72 *S. Ct.* 398, 96 *L. Ed.* 448 (1952).

Actual domicil is the jurisdictional *sine qua non*. As said in the *Williams* cases, jurisdiction is the power to pass on the merits; and jurisdiction is founded on domicil. The State has a basic interest in the marital status of its domiciliaries, even to its alteration and dissolution. The Full Faith and Credit Clause forecloses extraterritorial inquiry beyond the existence of the jurisdictional fact. And, to quote from the second *Williams* case, the burden of "undermining the verity" of the sister state's finding of the juris-

dictional fact of domicil "rests heavily upon the assailant"; unless there be clear and convincing evidence of this jurisdictional deficiency, the burden is not sustained. "A judgment presumes jurisdiction over the subject matter and over the persons." *Cook v. Cook,* cited *supra.* We do not have here a sham change of domicil for the sole purpose of a divorce. It does not matter that the foreign judgment of divorce is "for a cause which occurred while the parties resided" in New Jersey, or "for a cause which is not ground for divorce under the laws" of New Jersey, if either of such be the case; these federal constitutional principles supersede the state policy embodied in *R. S.* 2:50–35, now *N. J. S.* 2*A*:34–22, in so far as there may be conflict. Where, as here, there was jurisdiction of the matrimonial *res,* the foreign judgment is conclusive and wholly immune to extraterritorial attack. *Peff v. Peff,* cited *supra; Hubschman v. Hubschman,* 140 *N. J. Eq.* 284 (*E. & A.* 1947); *Giresi v. Giresi,* 137 *N. J. Eq.* 336 (*E. & A.* 1945).

And, for the selfsame reasons, the New Jersey injunction is without efficacy on this inquiry. The defendant wife was then domiciled in California; the marital *res* was there; and New Jersey was powerless to intrude upon California's jurisdiction of the subject matter by the use of the *in personam* injunctive process in a manner not comporting with the requirements of due process. A court of equitable jurisdiction may, by acting upon the person of a party within the territorial jurisdiction, enjoin the prosecution of an action in another forum between the same parties involving the same subject matter. The restraint is directed against the litigant, not the foreign jurisdiction. It constitutes an exercise of equity's jurisdiction *in personam* operative upon those within the reach of the court's process. *O'Loughlin v. O'Loughlin,* 6 *N. J.* 170 (1951). See 28 *Am. Jur.* 385. But such was not the case here. The matrimonial *res* was in California, certainly that was the place of the wife's habitation and domicil, and New Jersey did not have jurisdiction of the person. So far as state power is concerned, there is no distinction between a matrimonial

domicil and a domicil later acquired. *Williams v. North Carolina*, 317 *U. S.* 287, 63 *S. Ct.* 207, 87 *L. Ed.* 279 (1942). The principle is exemplified in *Armour v. Armour*, 142 *N. J. Eq.* 337 (*E. & A.* 1948). Compare *Von Bermuth v. Von Bermuth*, 76 *N. J. Eq.* 177 (*Ch.* 1909); *Kempson v. Kempson*, 63 *N. J. Eq.* 783 (*E. & A.* 1902).

And now that the validity of the foreign divorce is established, the application of the divorced wife for alimony under *N. J. S.* 2A:34–23, formerly *R. S.* 2:50–37, remains to be determined; and proceedings may be had to that end.

The judgment is reversed; and the cause is remanded for further proceedings conformably to this opinion.

VANDERBILT, C. J. (dissenting). The only question raised on this appeal is the effect to be given to the California divorce decree obtained by the wife. The majority finds that the matrimonial domicile was established in California since the plaintiff joined his wife there "under circumstances unmistakably indicating a common intention to establish their domicile there" and on the basis of this finding it holds that since the California court had jurisdiction of both the subject matter and the person its judgment must be accorded full faith and credit in our courts.

The conclusion that the matrimonial domicile was in California is contrary to the finding of the trial judge which is as follows:

"I find and conclude that the plaintiff is and has been a *bona fide* resident of the State of New Jersey. It was to the State of New Jersey that he returned after his discharge from service and to which he brought his wife to make their home. However, she left him within a few days and returned to New York and ever since that time has refused to return to New Jersey to live with him. He did go back to visit and live with her in New York two or three times a week. His home, however, was in New Jersey and he was gainfully employed in Paterson. Within a comparatively short time after the marriage she admits that she asked her husband for a divorce; that she wrote to him for a divorce or an annulment while he was overseas, and that she had her brother arrange for a conference with the plaintiff and his family and lawyers for the respective sides to consider the question of plaintiff getting a divorce from the defendant and the brother of the defendant indicated a

willingness to stand the expenses of the proceeding. The defendant took part in the conference and within a few days afterwards upon being examined by a doctor it was found that she was pregnant and as a result the proposed divorce was then abandoned. Within six weeks after the birth of the child the defendant was in the State of California with her family. The plaintiff endeavored to obtain a leave of absence from his employment and when it was denied he quit his job and went to California to get his wife to come back. He asked his wife to return to New Jersey with him and she refused. He thereupon returned to New Jersey where he has ever since maintained his residence. In the trial of this proceeding the plaintiff expressed a willingness to now make a home for his wife and child and no like statement of consent was forthcoming from the defendant. It is obvious her desire to end the marriage on the several occasions as hereinabove set forth makes crystal clear the reason for not acceding to her husband's request to live with him in New Jersey."

The evidence was conflicting but the trial judge gave greater credence to the testimony of the plaintiff, characterizing that of the wife as follows:

."Naturally, her statements concerning the marital status lack the tone of sincerity and the vibrant note of truth. Her testimony is vague, uncertain and contains admissions which, when considered with all of the testimony and evidence in the case, leaves no substance to her judgment demands for support and maintenance or for absolute divorce."

Even without applying *R. R.* 1:5–3 (*a*), which requires that when we find new facts in a non-jury case "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses," I find myself in agreement with the facts as found by the trial judge on this crucial issue. No reason has been advanced by the majority for rejecting his findings of fact.

I would therefore affirm the judgment of the Appellate Division of the Superior Court.

*For reversal*—Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—5.

*For affirmance*—Chief Justice VANDERBILT—1.